STATE EX REL. HARRIS, Appellant, v. ANNUITY & PENSION BOARD, EMPLOYEES' RETIREMENT SYSTEM OF CITY OF MILWAUKEE, and others, Respondents.

Supreme Court

*No. 76–051. Argued January 2, 1979.—Decided February 27, 1979.*
(Also reported in 275 N.W.2d 668.)

For appellant there were briefs by *William E. McCarty* and *Charne, Glassner, Tehan, Clancy & Taitelman, S. C.,* and oral argument by *Mr. McCarty,* all of Milwaukee.

For the respondents the cause was argued by *Joseph H. McGinn,* principal assistant city attorney, with whom on the brief was *James B. Brennan,* city attorney.

HEFFERNAN, J. This case was brought to the circuit court on writ of certiorari to review the findings of the Annuity and Pension Board of the Employees' Retirement System of the City of Milwaukee. The Board, after a hearing which lasted five days, denied Naomi Harris, the widow of Maurice D. Harris, M.D., the annuity which she sought.

Under the provisions of sec. 36.05 (5) of the Milwaukee City Charter, a widow of a city employee is entitled to a pension of one-half the average annual salary of the de-

ceased employee if there is proof that the death of the employee was the natural and proximate result of an accident which occurred while the employee was in the actual performance of his duties.

The basic argument of the petitioner is that Dr. Harris, a public health physician employed by the City of Milwaukee, sustained a fall on an icy sidewalk outside a school on February 9, 1965, and that this fall resulted in an extremely painful injury, which resulted in continued physical disability and psychological injury and depression. It is claimed that, as a consequence of this injury, Dr. Harris, on December 6, 1965, committed suicide by an overdose of Seconal, which had been prescribed for his pain. After an autopsy performed on the day of his death, the cause of death was determined to be generalized arteriosclerosis and arteriosclerotic heart disease.

Naomi Harris refused to accept the results of the autopsy and persisted in her contention that Dr. Harris committed suicide. As the result of an order of the Milwaukee Circuit Court, the body of Dr. Harris, which had been buried at the Arlington National Cemetery, was exhumed and a second autopsy was performed on February 17, 1971. That autopsy was performed by the chief medical examiner for the Commonwealth of Virginia, Dr. Geoffrey T. Mann. Dr. Mann, on the basis of toxicological tests, concluded that Dr. Harris committed suicide by taking an overdose of secobarbital (Seconal).

Subsequent to the second autopsy, Naomi Harris petitioned for a hearing on the grounds that she was entitled to the duty-death annuity. Following the Annuity and Pension Board's refusal to schedule a hearing, the Milwaukee Circuit Court issued a writ of mandamus on June 18, 1973, directing the Board to afford Naomi Harris a due-process hearing on the question asserted.

Following an extensive hearing in which 18 witnesses appeared, the Board, on May 15, 1975, issued its findings

and conclusions and entered its decision that Naomi Harris was not entitled to the duty-death benefits provided by sec. 36.05(5) of the Milwaukee City Charter. In support of its decision, the Board made the following findings:

"1. Dr. Maurice D. Harris sustained a physical injury while engaged in the course of his employment with the City of Milwaukee on February 9, 1965. The vote was unanimous.

"2. Dr. Harris did not commit suicide by means of an overdose of secobarbital on December 6, 1965. The vote was six (6) that he did not and two (2) that he did.

"3. The death of Dr. Harris on December 6, 1965 did not occur as the natural and proximate result of the accident of February 9, 1965. The vote was seven (7) that it did not and one (1) that it did.

"Therefore, the Annuity and Pension Board of the Employes' Retirement System of the City of Milwaukee finds that Naomi Harris, Widow of Maurice D. Harris, deceased, is not entitled to the benefits provided by Section 36.05(5) of the Milwaukee City Charter."

By writ of certiorari, the Board's decision was reviewed by the circuit court for Milwaukee county.

The court concluded, after a review of the evidence, that the Board's action was not arbitrary, oppressive, or unreasonable, and specifically concluded "that the evidence was more than enough for the board to reasonably make the determination" that Dr. Harris did not commit suicide by means of an overdose or secobarbital on December 6, 1965. Judgment was entered affirming the findings and conclusions of the Annuity and Pension Board denying the preemptory writ of certiorari and granting the Board's motion to quash an alternative writ of certiorari.

On appeal from that judgment, petitioner argues that, because of the unreasonableness of the testimony of key witnesses presented by the Pension Board, the testimony

on which the Board's decision was based is insufficient. As a corollary to that evidentiary argument, it is argued that the evidence established that the death of Dr. Harris was suicide and that the suicide was proximately caused by the accident sustained while Dr. Harris was in the active discharge of his duties. It is also contended that the Board's findings were insufficient in that the reasons for its conclusion and decision were not detailed.

On the review of a judgment entered on certiorari, this court's function is to review not the judgment or findings of the trial court but, rather, is to review the record of the administrative board to whom certiorari is directed. Although the briefs of the parties indicate a dispute in respect to whether the review is statutory or common law certiorari, it was acknowledged by both the petitioner and the respondent at oral argument that in the instant case the distinction is irrelevant. Moreover, it is apparent from the record that the statutory certiorari which was provided by sec. 36.05(4)(m) and (n) of the Milwaukee City Charter was enacted subsequent to these proceedings and is inapplicable. Accordingly, the determination in the instant case is reviewable on the standards applicable to common law certiorari. The principal cases setting the standard for common law certiorari in this jurisdiction are *Stacy v. Ashland County Department of Public Welfare,* 39 Wis. 2d 595, 600, 159 N.W.2d 630 (1968), and *State ex rel. Kaczkowski v. Fire & Police Comm.,* 33 Wis.2d 488, 501, 148 N.W.2d 44, 149 N.W.2d 547 (1967).

The scope of review is limited to the record of the administrative proceedings and includes:

"(1) Whether the board kept within its jurisdiction, (2) whether it proceeded on a correct theory of law, (3) whether its action was arbitrary, oppressive, or

unreasonable and represented its will and not its judgment, and (4) whether the evidence was such that it might reasonably make the order or determination in question." *Stacy, supra* at 600; *Kaczkowski, supra* at 500.

Neither the jurisdiction of the Board nor the correctness of the legal theory followed by it is challenged.

The only question presented on this review is whether the action of the Board was arbitrary, oppressive, or unreasonable and represented its will and not its judgment. The fourth standard—whether the evidence was such that it might reasonably make the order—controls the third criterion.

The question is one of the sufficiency of the evidence. The sufficiency of evidence on review by common law certiorari is identical to the substantial evidence test used for the review of administrative determinations under ch. 227, Stats. *Stacy, supra* at 600–03. Under this standard a court does not pass on questions of credibility, nor does it weigh the evidence. The test is whether the evidence reasonably supports the decision. To reach this determination, it is necessary for this court—assuming credibility of the evidence, except where evidence may be incredible as a matter of law—to examine the record and to determine whether the evidence relied on by the Board is sufficient reasonably to support the decision.

The central factual issue determined by the Board was the cause of death. It was not disputed that the initial accident—the fall that Dr. Harris sustained—occurred while he was in the line of duty. The predicate upon which the petitioner's claim is based is that Dr. Harris committed suicide. If the decision of the Board that Dr. Harris died from a heart attack is supported by the evidence, then the additional issue raised—that the

alleged suicide was the direct and proximate result of the original injury—becomes moot.

The circuit court, in reviewing the record, correctly described the proceedings as a battle of the experts. Naomi Harris presented four experts, three pathologists and a toxicologist. The witnesses for the petitioner presented testimony which supported the conclusion that death was due to an overdose of Seconal. The pathologists presented by the Annuity and Pension Board submitted evidence that Dr. Harris died from a heart attack. In order to reach a conclusion in respect to the reasonableness or unreasonableness of the findings and decision of the Board, it is necessary to recount the testimony of the witnesses at some length.

Naomi Harris and the two children of Dr. and Naomi Harris testified about Dr. Harris' condition prior to his death. They all stated that he had been in great pain and had difficulty sleeping. Although the witnesses indicated that Dr. Harris had become very withdrawn, they stated that, on the day before the death, he seemed optimistic. On the morning of December 6, 1965, when Naomi Harris went to call him to keep an appointment with his physician, she found Dr. Harris unconscious in bed. She stated that the Seconal container was missing from the place where Dr. Harris normally kept it. She called a rescue squad, which took Dr. Harris to Columbia Hospital. He was dead on arrival.

Naomi Harris stated that, after her husband's death, she went through his drawers and pockets of his clothing and was unable to locate the Seconal container. This testimony was corroborated by both the son and daughter. The son also corroborated Naomi Harris' testimony that she had told the members of the rescue squad that Dr. Harris had taken something and should be pumped out. He additionally testified that his mother told two

physicians at the hospital that Dr. Harris had taken an overdose. Naomi Harris testified that she gave permission for an autopsy and asked that chemical tests be done for drugs. She claimed that Dr. Owen told her that, following the autopsy, tests for Seconal were negative. The first autopsy report contained no indication that chemical tests were done. She stated that she thought Dr. Owen was attempting to spare her feelings.

She testified that, later in the week of her husband's death, she found a note from her husband which was to the effect that he just could not go on. The note asked her to destroy the note, and she testified that she did so.

Irving Lowe, a lawyer who met with Naomi Harris on December 18, 1965, to discuss the probate of the estate, testified that Naomi Harris said her husband had left a note which indicated that Dr. Harris had committed suicide. He also said that Naomi Harris had told him that she had found empty Seconal vials.

In addition to these witnesses, Naomi Harris presented four expert witnesses, all of whom gave medical opinions that tended to show that Dr. Harris had committed suicide. Dr. Norbert Enzer, a pathologist, stated that he studied the first postmortem report and microscopic slides of the coronary artery. He stated that he was not satisfied that death was caused by arteriosclerosis. He said that his examination showed no indication that the heart muscle had been acutely damaged just before death or that there was any acute disturbance in the coronary artery. He acknowledged that the slide showed a degree of arteriosclerosis and that arteriosclerosis could be a cause of death if no other information were available. He gave as his opinion, however, that, based on the second autopsy report as well as the first, Dr. Harris had died of an overdose of Seconal. He stated that the original conclusion that the death was caused by

a heart attack, in the absence of other information, was the best "guess" of the cause of death.

Dr. Geoffrey T. Mann, the chief medical examiner for Brouward county, Florida, and chief medical examiner for the Commonwealth of Virginia at the time Dr. Harris' body was exhumed from Arlington National Cemetery, stated that even the first autopsy report, in view of the finding of discoloration of the lining of the esophagus, strongly suggested the possibility of barbiturate poisoning. He acknowledged that Dr. Harris had some pulmonary emphysema and some arteriosclerosis. Additionally, he stated that the second post-mortem laboratory tests showed a lethal concentration of secobarbital in both the brain and in the blood. He also stated that the staining of tissues, which was described in the first autopsy report, was indicative of Seconal poisoning. He gave as his opinion that Dr. Harris died as the result of ingesting a lethal amount of Seconal. He gave as his medical opinion, to a reasonable certainty, that Dr. Harris did not die of a heart attack. He, like Dr. Enzer, concluded that the original diagnosis of heart disease was supportable only on an exclusion basis where there was no other explanation. He stated his belief that a heart attack related to hardening of the arteries was unlikely without some stressful situation and that there was no indication of any particular stress at or about the time of Dr. Harris' death.

Dr. Robert V. Blanke, a pharmacologist and toxicologist, testified in respect to the procedures used in the tests for drugs done on Dr. Harris' liver and brain. He testified that the quantity of secobarbital in both the liver and the brain indicated a lethal dose. Although it was clear that Dr. Harris had been taking secobarbital therapeutically, he rejected the suggestion that he could have developed a tolerance to a normally lethal dose.

The final expert presented by Naomi Harris was Dr. Milton Helpern, the former chief medical examiner of New York City and a distinguished forensic pathologist. He criticized the original autopsy procedure because it failed to consider any cause of death other than arteriosclerosis. He acknowledged that the five or six years that elapsed between death and before the second autopsy limited its validity. He nevertheless concluded that the toxicological method employed in the second autopsy was standard and the results should have been accepted. He stated that his examination of the second autopsy report showed that Seconal in a substantial amount must have been ingested and that it was more probable that death was the result of secobarbital than from heart disease. He pointed out that the red staining of the esophagus is a frequent finding in cases of Seconal poisoning and is not found where only a medical dose is taken. He concluded that the level of heart disease indicated by the autopsy was such that it should not be considered the cause of death unless other possibilities of the cause of death were excluded.

It is apparent from the testimony of the witnesses presented by Naomi Harris that there was evidence which could have supported a finding of death by secobarbital poisoning. Testimony leading to a contrary inference was, however, presented by witnesses for the Annuity and Pension Board.

Two members of the rescue squad that came to the Harris home testified. One of them testified that Naomi Harris made no mention of her husband having taken pills or that this was a case of possible suicide. A patrolman assigned to the ambulance testified that Naomi Harris told the ambulance crew to hurry but said nothing about pills or suicide. The police department has a special report form for suicides, and that report was not used.

Dr. William M. Pfeifer, a physician who was on duty at Columbia Hospital when Dr. Harris was brought in, testified that he did not recall whether Naomi Harris said anything about her husband taking pills or attempting suicide. He said he probably would have recalled the incident if she had. He stated that the normal procedure when suicide is mentioned is to call the medical examiner, but this was not done. He admitted, however, that he did not recall much of the circumstances of the case. The hearing before the Annuity and Pension Board took place in 1975, nearly ten years after Dr. Harris' death.

The city's principal medical witness was Dr. Roland C. Brown, a pathologist and former assistant medical examiner for Milwaukee county. He was hired by the Pension Board to investigate the case. He submitted a 42-page report to the Board, which was based on a transcript of the worker's compensation hearing, a summary of the case prepared by the Pension Board secretary, the two autopsy reports, sworn statements from rescue squad and police personnel, and consultations with a number of pathologists and toxicologists. He stated that the first autopsy report showed evidence of an earlier heart attack. He also stated that the lack of blueness of the skin, described in the first autopsy report, indicated that Dr. Harris was getting adequate oxygen into his blood stream up to the time of death. This was inconsistent with the taking of a depressant drug like Seconal, which stops respiration. He criticized the chemical tests performed after the second autopsy, because, he said, body organs had been mixed in a plastic bag and, therefore, a definitive test could not be made of any particular organ. He stated that high levels of Seconal might well be found in the body of a person who used the drug regularly. He stated that, after five and one-half years, there would be no way to

determine the barbiturate levels in the body at the time of death. He concluded that the death resulted from an acute coronary insufficiency. He acknowledged that he was not an expert toxicologist; and he admitted that, in at least one instance, he had made a mistake in his report in the use of a toxicological study.

Dr. Charles S. Petty, a pathologist and the chief medical examiner of Dallas county, Texas, testified that, after reviewing both autopsy reports, the toxicological reports, and other materials, it was his opinion that Dr. Harris died of heart disease. He acknowledged that there was some secobarbital in Dr. Harris' system at the time he died, but he stated that the levels of seco-barbital could not be reliably determined after the embalming of the body and the mixture of the organs in the plastic bag. He said that the level of secobarbital in the brain indicated the presence of secobarbital, but that it could not be assigned much importance because of the alteration in the tissues by embalming, dehydration, and shrinkage. He also stated that it was possible for a person to have a heart attack while at rest and concluded that, in the absence of other disease processes of significance, the death was due to a heart attack.

Dr. Irving Sunshine, chief toxicologist of the Cuyahoga county, Ohio, coroner's office and a professor of toxicology at Case Western Reserve University Medical School, challenged some of the toxicological findings reported by Dr. Blanke. He stated that the red staining of the esophagus simply meant that Dr. Harris had eaten something containing a red dye and that a number of substances contain such dye. While he acknowledged that the concentrations of secobarbital in Dr. Harris' tissues were consistent with an indication that Seconal could have been a cause of death, he did not accept those quantitative conclusions in the circumstances.

There was also undisputed evidence that, at the time of the first autopsy, the lung weight was substantially normal and that, had the death been caused by secobarbital poisoning, the edema or liquid content of the lungs would ordinarily have been considerably higher. Dr. Petty, in particular, in assigning the cause of death as heart disease, placed emphasis on the lack of pulmonary edema, which apparently is a concomitant of secobarbital poisoning.

After hearing this testimony, the Annuity and Pension Board, by a vote of six to two, concluded that Dr. Harris did not commit suicide by means of an overdose of secobarbital. The evidence on both sides of the issue was voluminous and contested; but the question presented on certiorari is whether, in light of the evidence, the order or determination made was reasonable or whether the Board's action was arbitrary, oppressive, and unreasonable and represented its will rather than its judgment.

It is true, as the trial court stated, that, based upon Naomi Harris' testimony, together with that of Drs. Enzer, Mann, Blanke, and Helpern, the Board could have found that Dr. Harris' death was suicide. It was just as reasonable for the Board to give credence and weight to the other witnesses presented. The witnesses on both sides of the issue were, to some degree, impeached and contradicted; but the question, as pointed out by the trial court, was one to be determined by the trier of the facts. In the absence of incredibility as a matter of law, the court cannot ignore testimony relied upon by the finder of fact.

This court's role on review of administrative findings on certiorari does not include the weighing of evidence or assessing the credibility of witnesses. In light of the evidence found credible and which was presented to the

Board, we can only conclude that the Board reasonably made the determination that Dr. Harris' death was not caused by suicide.

The petitioner also contends that, at the very least, this court should require a remand to the Board, with directions that specific findings be made. It is contended that the Annuity and Pension Board abused its discretion in failing to file a written decision setting forth its reasons for its findings. We conclude that, in the circumstances, the requested remand is inappropriate.

At the time the circuit court ordered the Annuity and Pension Board to hold a hearing, it also ordered that the provisions of secs. 227.07 through 227.13, Stats. 1973, be observed. Sec. 227.13, Stats. 1973, provides:

"227.13 **Decisions.** Every decision of an agency following a hearing shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence."

It is clear, however, that sec. 227.13, Stats. 1973, is not directly applicable to matters heard by the Annuity and Pension Board. That section applies only to hearings of state agencies. However, as a matter of due process and sound administrative procedures, even when that section of the statutes is not applicable, an administrative agency is required to make definite and certain findings of fact, together with its conclusions of law. *Edmonds v. Board of Fire & Police Commissioners,* 66 Wis.2d 337, 345–49, 224 N.W.2d 575 (1975); *Transport Oil, Inc. v. Cummings,* 54 Wis.2d 256, 263–65, 195 N.W.2d 649 (1972). It is apparent, however, that the statute which sets forth the requirements of due process has been complied with. The decision was in writing and the

findings of fact are sufficiently set forth. The statute requires that:

"The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without *recital of evidence.*" (Emphasis supplied.)

The ultimate factual conclusion on which the Board based its decision was: "Dr. Harris did not commit suicide by means of an overdose of secobarbital on December 6, 1965." No recitation of what evidence was believed and what was rejected was necessary to comply with the elements of due process. The conclusion of law is sufficient in that it states that the widow was "not entitled to the benefits provided by Section 36.05(5) of the Milwaukee City Charter." There is no requirement that the administrative agency indulge in the elaborate opinion procedure of an appellate court. It is sufficient if the findings of fact and conclusions of law are specific enough to inform the parties and the courts on appeal of the basis of the decision.

It is apparent from the briefs of the parties that they were fully cognizant of the disputed items of evidence. As the trial court pointed out, a review of the record "makes it obvious respondents adopted the views of Drs. Brown, Petty and Sunshine and rejected those of Drs. Mann, Blanke, Enzer and Helpern . . . ."

This case is distinguishable from *Edmonds v. Board of Fire & Police Commissioners,* 66 Wis.2d 337, 224 N.W.2d 575 (1975). In that case this court pointed out "the factual basis of the board's decision is unknown." (at 349)

In the instant case, the basis of the Board's ultimate factfinding could hardly be clearer in view of the record before us on certiorari. In arguing the case on appeal, the attorneys for Naomi Harris had no difficulty in pinpointing the crucial factual issues and the crucial

testimony on which the Board's ultimate conclusion rested. From our review of the entire record, we conclude that the factual basis for the decision was clear.

While those facts were disputed, the question of credibility and weight was for the Board. There is no evidence of denial of due process in respect to the findings and conclusions of the Board. They were sufficiently specific to afford adequate appellate review, as was evidenced by the specificity and detailed focus of appellant's counsel in the proceedings before this court.

We conclude that the findings of fact and conclusions of law of the Annuity and Pension Board were based upon sufficient evidence in view of the record as a whole.

*By the Court.*—Judgment affirmed.