OLD TUCKAWAY ASSOCIATES LIMITED PARTNERSHIP and
Affiliated Capital Corp., Plaintiffs-Appellants,

v.

The CITY OF GREENFIELD, WISCONSIN, Defendant-
Respondent.

OLD TUCKAWAY ASSOCIATES LIMITED PARTNERSHIP and
Affiliated Capital Corp., Plaintiffs-Appellants,

v.

The CITY OF GREENFIELD BOARD OF APPEALS, Defendant-
Respondent.

Court of Appeals

*No. 92–1162. Submitted on briefs March 3, 1993.—Decided
November 16, 1993.*

(Also reported in 509 N.W.2d 323.)

254

256

257

258

259

For the plaintiffs-appellants the cause was submitted on the briefs of *Foley & Lardner* by *Michael A. Bowen* and *Kurt S. Meckstroth*, of Milwaukee.

For the defendants-respondents the cause was submitted on the briefs of *Michael, Best & Friedrich* by *John A. Busch* and *Charles P. Graupner*, of Milwaukee and *Roger C. Pyzyk*, of West Allis.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

WEDEMEYER, P.J.   Old Tuckaway Associates, a limited partnership, and Affiliated Capital Corp. (collectively, Tuckaway), appeal from a final judgment

entered in favor of the City of Greenfield (City) and the City of Greenfield Board of Zoning Appeals.

Tuckaway presents the following issues for review: (1) whether the trial court, in its court-trial decision, erred in denying Tuckaway's claims that the City's actions, overall, deprived Tuckaway of property and liberty without due process of law; (2) whether the trial court, following a certiorari review, erred in concluding that the Board of Zoning Appeals properly denied Tuckaway's appeal from the City's rejection of a petition for an amended Planned Unit Development (PUD); and (3) whether the trial court, in its summary judgment determinations, erred in granting judgment in favor of the City on Tuckaway's claims for inverse condemnation, breach of contract and tortious interference with a contract. We affirm.

## I. BACKGROUND

This action arises out of a land use regulation dispute. In 1967, the management of the Tuckaway Country Club golf course decided to relocate the golf course from Greenfield to Franklin. In an effort to defray the costs of the new facility in Franklin, the Country Club sold the newly vacant land in Greenfield to a group of investors known as Tuckaway Club Enterprises. Shortly thereafter, Tuckaway Club Enterprises and the City of Greenfield executed a Declaration of Restrictions (Declaration) pursuant to which various zoning, density and use limitations were placed on the property. The Declaration effectively established a

Planned Unit Development (PUD)[1] that permitted the flexible development of the former golf course land.

[1] To understand the issues involved in this appeal, it is important to briefly examine the meaning of the planned unit development concept in the context of zoning law principles.

> A Planned Unit Development (PUD) is a type of zoning district designed to encourage the efficient and optimal utilization of land. A typical PUD may contain a planned mix of residential (detached homes, townhouses, apartments, or combinations of such buildings), commercial and industrial uses. PUD's [sic] are premised on the concept of density zoning, that is, the intensity of use to which land may properly be developed. The PUD differs from the traditional zoning in that the type, density and placement of land uses and buildings, instead of being detailed and confined to specified districts by local legislation in advance, is determined by contract, or deal, as to each development between the developer and the municipal administrative authority, under broad guidelines laid down by state enabling legislation and an implementing local ordinance.

*Powell on Property*, Vol. 4A, sec. 630.10[1] (footnote omitted).

As pertinent, sec. 62.23(7)(b), Stats., and sec. 21.47 of the City of Greenfield Zoning Code Ordinance implement this formula. As noted in sec. 21.47(1) of the Zoning Code, planned unit development allows for greater flexibility and design freedom than normally permitted by the standard application of the normal Zoning Code regulations "where the unified and planned development of such tract would make possible more desirable utilization of the site and produce a more esthetically [sic] satisfying and economically desirable development than would result from the application of normal district controls."

To obtain such a district classification, the following procedure must be pursued. The developer must submit a petition to the city building inspector. Section 21.47(4)(b). The petition must contain, among other matters, the following type of information: a general description of the intended project, statistical data relating to the size, diversity and impact upon municipal services, the project's financial viability, organizational structure, a map of the project, architectural plans and drawings,

Over the years, Tuckaway Club Enterprises selectively developed portions of the land that had once been the golf course. By 1987, only thirty-two acres of the property remained undeveloped. Tuckaway, the plaintiffs in the present action, expressed interest in purchasing these thirty-two acres from Tuckaway Club Enterprises for development purposes. Land use restrictions applying to portions of the thirty-two-acre tract by virtue of the 1967 Declaration, however, made development unattractive.[2] Thus, Tuckaway's eventual agreement to purchase the property was contingent on the ability of Tuckaway Club Enterprises to persuade the City to amend the Declaration to a more amenable classification, i.e., a classification

---

landscape plans, and public service plans. Section 21.47(4)(b)1 and 2. The building inspector's office then reviews the contents of the petition, determines if the information is sufficient, and forwards it to the Planning Commission. Section 21.47(4)(c). The Planning Commission reviews the petition, makes a recommendation, and forwards the petition to the Common Council. *Id.* After a public hearing, the Common Council then decides whether to grant the request. Section 21.47(4)(d). As a basis for its decision-making process, both the Planning Commission and Common Council are guided by, among other things, the following consideration:

> That such development will create an attractive residential environment of sustained desirability and economic stability, compatible with the character of the City, and where the economic impact of the development in terms of income levels, property value and service demands is substantially more beneficial to the community as that which could be anticipated under the basic zoning.

Section 21.47(5)(h)1.

[2] As an example, under the Declaration, a portion of the 32-acre tract was zoned to allow a ten-story high rise, a use clearly not in conformity with the surrounding neighborhoods as of 1987.

that allowed a reasonable density of units per acre throughout the entire tract of land.

On November 6, 1987, following discussions with surrounding neighbors concerning the flow of vehicular traffic, Tuckaway agreed to construct a new road on the property in an attempt to alleviate residents' concerns. Following this offer, the City executed an Amendment to the Declaration of Restrictions (Amendment). The Amendment provided, in part, that the thirty-two-acre parcel would be zoned PUD with residential uses and that the density of dwelling units on the property could not exceed seventeen units per acre. The Amendment further provided that it "is complimentary to the Planned Development Ordinance of the City and that the development hereinabove described is subject to the ordinance." After the Amendment was recorded, Tuckaway completed the purchase of the thirty-two-acre tract from Tuckaway Club Enterprises.

In 1989, Tuckaway decided to sell approximately five acres of the property rather than develop it themselves. Consequently, on July 12, 1989, Tuckaway executed an Offer to Purchase with David Morgenson, a private developer, for approximately five acres of the thirty-two-acre tract. Morgenson intended to develop the five-acre tract with residential dwellings. The Offer to Purchase was subject to the following condition:

> This Offer is contingent upon the Buyer obtaining the necessary zoning and building permits from the City of Greenfield and the State of Wisconsin and all other governmental regulatory agencies having jurisdiction to permit the construction of at least 83 residential rental units acceptable to Buyer in at least 2-3 separate residential buildings with separate tax bills on these parcels within 90 days from

August 15, 1989 or this Offer will be deemed null and void.

Subsequently, Morgenson and his associate in development, Joseph Gallina, prepared plans for the construction of eight ten-unit buildings (the "Project"). On October 10, 1989, Gallina petitioned the Planning Commission for approval of the Project. Concerned citizens at the meeting expressed objections to the Project, particularly because of the density of the Project and the developer's intention to rent a portion of the units. The meeting was adjourned without Project approval.

Over the next four months, Gallina appeared before the Planning Commission on several occasions. At each of these meetings, the issue of density and/or rentals was of great concern to the neighbors surrounding the proposed development. In response to the issue of density, the City obtained two legal opinions which concluded that the proposed density did not violate any City ordinances. The City also received an opinion from its attorney that once the Project was completed, the City would have no legal authority to prevent the owners from renting the units.

On January 30, 1990, the Planning Commission considered Gallina's petition for an amendment to the Declaration. After listening to the legal opinions concerning density, and following some discussion by Alderman Snyder regarding a discrepancy in the way the "mean density" figure was calculated, the Planning Commission, on a motion by Alderman Waite, recommended that the Common Council reject Gallina's petition for an amendment. The motion carried by a four-to-one vote.

On February 13, 1990, the Planning Commission voted to reconsider its January 30 action. Alderman Waite noted that his motion of January 30 was improp-

erly based upon density and mean number. He further stated that his true intent was that the amendment should be denied based on the fact that it was a major change to the existing PUD. Alderman Waite then presented a motion that the Common Council deny "the request to amend the Tuckaway Plan Unit Development Agreement for the Oaks of Tuckaway . . . on the grounds that this is a major change to the Plan Unit Development and as a major change to a PUD would require a public hearing." On a roll call vote, the motion carried unanimously.[3]

The Project was again the subject of debate at a March 27, 1990, Planning Commission meeting. During this meeting, the city engineer brought up nine points that, because of the intense consideration of the density and rental issues, had not been adequately addressed. Principal among these points was the need to present revised plans that would bring the proposed

---

[3] As is standard operating procedure in Greenfield, the recommendation of the Planning Commission was sent on to the Common Council for consideration at its March 7, 1990 meeting. Before any action was undertaken by the Council concerning the Planning Commission's recommendations to reject Gallina's petition for acceptance of the Project, however, Alderman Waite stated the following:

> At this time it is both the feelings [sic] of the City Attorney and myself that this item should be referred back to the Planning Commission and both of the motions which were made at that time to be dropped at this point so that this matter can be reopened due to the extreme amount of confusion which has taken place on this matter over issues which should have never been issues. Due to the confusion there was a number of deficiencies and it's time that we sent this back to the Planning Commission so that we can relook at the situation and issue a proper decision.

A subsequent motion to refer the matter back to the Planning Commission was unanimously passed.

buildings into conformity with the City's height requirements. The Commission asked the developers to submit a formal response to the city engineer's points.

Ten months later, on January 29, 1991, Tuckaway submitted plans addressing the nine technical concerns raised by the city engineer. On February 12, 1991, the Commission voted to forward the petition to the Common Council with no recommendation—other than a recommendation to conduct a public hearing.

The Common Council held public hearings on April 3 and April 8, 1991. At the April 8 meeting, the Council voted unanimously to reject the project on grounds of aesthetic compatibility and economic feasibility.

Tuckaway appealed the adverse decision of the Common Council to the City's Board of Zoning Appeals. On June 27, 1991, after oral and written submissions by both Tuckaway and the City, the Board unanimously upheld the determinations of the Common Council.

From this procedural history arose two separate causes of action. First, in August of 1990, Tuckaway filed a lawsuit against the City alleging that, rather than reject the Project on grounds that would not stand up to judicial scrutiny, the City was trying to thwart the Project by evading any decision at all. Consequently, Tuckaway's complaint alleged that the City's delay in rendering a decision violated its rights to due process. Second, following the Board of Zoning Appeals' decision to uphold the ruling of the Common Council denying approval of the Project, Tuckaway sought certiorari review of the decision. The trial court consolidated the two cases. The due process claim was tried to the court on November 13 and 14, 1991. The

trial court ruled that Tuckaway had not met its burden on the due process claim. The trial court also concluded that the Board of Zoning Appeals had acted within its discretion in denying approval for the Project. Tuckaway now appeals.

## II. DUE PROCESS CLAIM

Tuckaway first argues that the trial court erred in concluding that the City did not deprive Tuckaway of property and liberty without due process of law. This claim is based on what Tuckaway characterizes as the City's deliberate refusal to timely and meaningfully consider the petition for approval of the Project.

Initially, the City moved for summary judgment on the due process issue. Following argument by counsel, the trial court stated:

> The one thing that really has made me think and there really isn't a lot of case law on this but it is certainly going to justify Mr. Bowen to stay here for awhile and that is this constitutional denial of due process and the manner in which the plan commission was delaying consideration of this project and the history that was related by Mr. Bowen in his brief about what took place on the different meetings of this plan commission over a long period of time.

Consequently, the trial court ordered that "[t]he defendant's motion for Summary Judgment on the First Claim (Denial of Due Process) is denied insofar as the claim seeks remedy for an alleged denial of due process from the defendant's delay in reaching a decision on plaintiff's petition for development."

The matter then proceeded to trial by the court as a tort of intentional denial of procedural due process.[4]

---

[4] While our supreme court has yet to recognize such a tort, we conclude that the trial court did not err in allowing plaintiffs to pursue a direct damage action based on an intentional denial of due process under the state constitution. Allowing this type of damage action is a logical extension of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), wherein the Court observed that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." In *Bivens,* the Supreme Court held that the Fourth Amendment guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority, and that individuals whose constitutional rights have been so violated may recover damages directly under the constitution as a result of federal agents' violation of that amendment. *Id.* at 395. Subsequent to *Bivens,* the Court has held that violations of the Fifth and Eighth Amendments also give rise to an individual damage action directly under the United States Constitution. *See Davis v. Passman,* 442 U.S. 228 (1979) (Fifth Amendment); *Carlson v. Green,* 446 U.S. 14 (1980) (Eighth Amendment). We also note that a number of other states recognize a common law action for damages pursuant to a violation of state constitutional rights. *See, e.g., Moresi v. State,* 567 So. 2d 1081 (La. 1990); *Widgeon v. Eastern Shore Hosp. Ctr.,* 479 A.2d 921 (Md. 1984); *Corum v. University of North Carolina,* 413 S.E.2d 276 (N.C. 1992).

The City's contentions to the contrary notwithstanding, *Kurtz v. Waukesha,* 91 Wis. 2d 103, 280 N.W.2d 757 (1979), does not preclude this court from recognizing that an individual may seek damages for a violation of those rights guaranteed by the state constitution. In *Kurtz,* the plaintiff sued the City of Waukesha for sex discrimination under the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and under Article I of the Wisconsin Constitution. Finding that the plaintiff stated a valid claim under 1983, the supreme court

After hearing evidence for two days, the trial court, in a written "Decision and Order," denied Tuckaway's due process claim stating:

> The gravamen of procedural due process is notice and an opportunity to be heard with protections afforded based on the demands of the situation involved. Since it must of necessity be an intentional tort, Tuckaway must so prove by evidence that is clear, satisfactory and convincing.
>
> Herein, plaintiffs have not even met the ordinary civil burden let alone the so-called middle burden. Can anyone seriously argue that plaintiffs [through Gallina] were not afforded the opportunity to be heard. Numerous meetings with technical people and Plan Commission members were held with full discussion of the facts, merits and objectives of the project. In addition there were public hearings held whereat [sic] Gallina explained the project.
>
> Plaintiffs [and Gallina] are obviously disappointed and disgruntled at how they were "horsed around" for a lengthy period of time prior to rejection but they did have every opportunity to be heard. Whatever possible tort that exists for denial of due process fails for almost total lack of proof.
>
> . . . .
>
> Tuckaway claims it took 18 months from the time of the first pre-petition conference until eventual rejection in early April 1991 whereas the average PUD processing period usually took six months.
>
> While factually correct ten of those eighteen months are attributable to Gallina's foot-dragging in presenting revised plans necessitated by his buildings exceeding the city's height ceilings.

had no occasion to determine the validity of the claim brought under the Wisconsin Constitution and specifically declined to address that issue. *Id.* at 117, 280 N.W.2d at 765.

Whether Gallina's reluctance to proceed was justified or not, the fact is most of the processing delay is attributable to plaintiffs and not the city.

■

The United States Supreme Court has noted the following regarding the Due Process Clause: "As our decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). One specific implication of this rule is that "[u]nreasonable administrative delay can deprive a party of property without due process." *Chicago & N. W. R.R. v. LIRC*, 91 Wis. 2d 462, 480, 283 N.W.2d 603, 612 (Ct. App. 1979), *aff'd*, 98 Wis. 2d 592, 297 N.W.2d 819 (1980). Further, a governmental action that is arbitrary, irrational or tainted by improper motive violates an individual's right to due process. *Bello v. Walker*, 840 F.2d 1124, 1129 (3rd Cir.), *cert. denied,* 488 U.S. 868 (1988). In conjunction with these statements of law, we are guided by the rule that on review, findings of fact made by the trial court will not be set aside unless clearly erroneous. *See* sec. 805.17(2), Stats.

Our review of the record reveals that the trial court's findings of fact in regard to Tuckaway's due process claim were not clearly erroneous. First, there is ample proof that Gallina did indeed cause a substantial portion of the delay in the petition process. Gallina admitted that he had "dragged his heels" in attempting to obtain approval for the Project. He also stated that "the fact that it took until February 1991 to submit this [a response to the city engineer's nine points of contention] was solely and exclusively at my feet." Further, the trial court found that Tuckaway's threats of litigation also resulted in some delay: "These threats

stiffened the City's resolve and also made it more responsible to see that proper legalities were observed." This finding is also amply supported. As noted by Alderman Waite in describing his motivation for resubmitting the issue to the Planning Commission, "Mr. Loeb [a partner in Tuckaway] threatened that you guys are going to get the [expletive] sued out of you."

Additionally, as noted by the trial court: "Numerous meetings with technical people and Plan Commission members were held with full discussion of the facts, merits and objectives of the project. In addition there were public hearings held whereat [sic] Gallina explained the project." The bottom line is that the administrative delay was not unreasonable.

Given these facts, we conclude that Tuckaway was afforded ample opportunity to be meaningfully heard concerning the petition for Project approval. The record supports the trial court's determination that the City did not orchestrate procedural irregularities in an effort to avoid meaningful consideration of the Project. On the contrary, the City simply proceeded cautiously in an effort to obtain a result that it believed was both correct and legally sound in light of the concerns raised by those involved in the process. Accordingly, we affirm the trial court decision that Tuckaway failed to meet its burden of proof concerning a claim for the intentional denial of due process and, therefore, the trial court committed no error in denying the claim.[5]

---

[5] The issue of whether the due process claim was barred by the immunities provision of sec. 893.80(4), Stats., was briefed and properly presented, but has become moot because of our affirmance that the appellants have not met their burden of proof in presenting the claim.

## III. CERTIORARI PROCEEDING

Tuckaway's next claim concerns the Board of Zoning Appeals' affirmance of the Common Council's decision to reject approval for the Project. On certiorari, the trial court upheld the decisions of both the Council and Board. Tuckaway takes issue with the manner in which the Council and Board proceeded. Tuckaway asserts: (1) the Board and the Council proceeded under an incorrect theory of law; (2) the record provides no reasonable basis for rejecting the Project on aesthetic or economic feasibility grounds; and (3) the Board's decision was not supported by factual findings or rationally expressed.

Our consideration of these assertions is guided by *Ledger v. Waupaca Board of Appeals*, 146 Wis. 2d 256, 261, 430 N.W.2d 370, 371-72 (Ct. App. 1988), where we stated:

> Certiorari proceedings are limited to the record made before the administrative body and are quite narrow in scope. The reviewing court is limited to determining four issues: (1) whether the board acted within its jurisdiction and authority; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive or unreasonable; and (4) whether the evidence was such that the board might reasonably make the determination it did.

### A. *Theory of Law*

Tuckaway first argues that the Council and Board of Zoning Appeals proceeded under an incorrect theory of law because they applied criteria pertinent to a proposed new PUD instead of those pertinent to a

273

proposed amendment to an existing PUD. Tuckaway argues: (1) the criteria to be applied to review of a proposed change to an approved PUD are found in sec. 21.47(7)(d) of the zoning code; (2) aesthetics and economic feasibility are not listed as review criteria in this subparagraph; and (3) therefore, when the Common Council utilized aesthetics and economic feasibility as bases for denial, it applied irrelevant criteria, and when the Board upheld that application, it erred. We are not persuaded.

■

Section 21.47(7)(d) provides, in relevant part:

> Any subsequent change or addition to an approved plan shall first be submitted for recommendation to the Plan Commission. The Plan Commission shall make its recommendation to the City Council. If, in the City Council's opinion, the change or addition is substantial, keeping in mind subpar. 1., 2., 3., 4., the City Council shall call for another public hearing. *Without limitation to the City Council's right to determine any other substantial change*, a change in any of the following may be construed to be as substantial.

The Code goes on to delineate four changes which constitute a substantial change—none of which includes the concepts of aesthetics and economic feasibility. This, however, is not controlling. Section 21.47(7)(d) indicates that the Council *is not limited to the four substantial change listings*. Thus, the Council was free to consider aesthetics and economic feasibility in rendering its decision.[6]

---

[6] We note also that sec. 21.47(5) of the Zoning Code—"BASIS FOR APPROVAL"—lists aesthetics and economical feasibility as appropriate factors in the determination

## B. Aesthetics and Economic Feasibility

Tuckaway next argues that even if aesthetic and economic factors are proper standards to be applied in reviewing its petition for the Project, the record is barren of any grounds to support rejection of the petition on these bases. We disagree.

The minutes of the various hearings reflect concern among both citizens and city officials regarding the construction of a new project in their community. A careful review of these minutes suggests that the potential existence of rental usage caused great concern. The rental vacancy rate in other projects called to question the economic feasibility of the project. Further, the question of density focused attention on possible traffic, congestion and service problems. Finally, the design compatibility of the Project with other surrounding neighborhood buildings was discussed. Many of the citizens voiced their opposition to the design compatibility of the Project. In sum, the record contains ample support for the Project to have been rejected on aesthetic and economic factors.

## C. Factual Findings of the Board

Tuckaway lastly claims that the Board of Zoning Appeals' decision was procedurally improper because the Board failed to make findings of fact or to articulate any reason for its decision. Tuckaway argues that, at a minimum, the matter should be remanded to the Board to allow it to make specific findings of fact with respect

of whether a petition for a planned development should be granted. Thus, these factors were not simply "created for the convenience of the moment;" rather, they are legitimate considerations under the Greenfield Zoning Code.

to its appeal. *See Edmonds v. Board of Fire & Police Comm'rs,* 66 Wis. 2d 337, 346-48, 224 N.W.2d 575, 580-81 (1975) (where factual basis for board's decision is unknown, case should be remanded to the board for specific findings of fact and conclusions of law).

A review of the record reveals the following. The Board of Zoning Appeals met on June 27, 1991, to consider Tuckaway's appeal. Both parties were present and were represented by counsel. The chairman of the Board, with no objections from the parties, announced that the Board would hear statements from counsel representing both Tuckaway and the City. The Board had before it substantial written argument, a complete set of the Common Council's minutes concerning the April 3 and 8, 1990 meetings, and a tape of a meeting held April 5, 1990, between the city attorney and counsel representing the competing interest groups. Following the arguments of counsel, Alderman Allan moved to deny the appeal, stating:

> I believe the Common Council has every right to make its decision based on aesthetics and economics in all PUDs. These are prime reasons for their Council to even be considering a project. How it could act if it didn't decide on these very important issues if aesthetics and economic factors were what the Council based its decision on, and I think the Council was correct.

Thereafter, by roll call, all members of the Board voted to deny Tuckaway's appeal.

In *State ex rel. Harris v. Annuity & Pension Bd.,* 87 Wis. 2d 646, 275 N.W.2d 668 (1979), our supreme court had the opportunity to examine what was minimally required to satisfy due process requirements. There,

the petitioner, citing the rule of *Edmonds*, contended that the Board erred in failing to file a written decision setting forth the reasons for its findings. *Id.* at 660, 275 N.W.2d at 675. The petitioner argued, as does Tuckaway here, that remand should be made with directions to make specific findings. *Id.* The court declined to remand concluding, under the circumstances, that remand was "inappropriate." *Id.* In reaching its decision, the court stated the following: "There is no requirement that the administrative agency indulge in the elaborate opinion procedure of an appellate court. It is sufficient if the findings of fact and conclusions of law are specific enough to inform the parties and the courts on appeal of the basis of the decision." *Id.* at 661, 275 N.W.2d at 675. *See also Synder v. Waukesha County Zoning Bd.*, 74 Wis. 2d 468, 476, 247 N.W.2d 98, 103 (1976), ("[F]indings of the board may not be disturbed if any reasonable view of the evidence sustains them.").

In the present case, the findings of fact and the conclusion of law rendered by the Board of Zoning Appeals were specific enough to inform the parties, as well as this court on appeal, of the basis of the decision. As noted above, the Board had before it the minutes from the Common Council's meetings regarding the project and entertained statements from both parties concerning all facets of the Project. Although succinct, the findings of the Board are clear—the Council rejected the Project based on aesthetics and economic feasibility, both of which were proper criteria on which to render a decision. Based on these considerations, the Board denied Tuckaway's appeal.

We conclude that a remand for a detailed set of findings is not necessary to satisfy minimal due process requirements.

## IV. SUMMARY JUDGMENT RULINGS

Tuckaway next posits that the trial court erred in granting adverse summary judgment rulings on its claims for inverse condemnation, breach of contract and tortious interference with a contract. We examine each contention *seriatim*.

In reviewing a motion for summary judgment, appellate review is *de novo*, utilizing the same methodology as the trial court. *Bong v. Cerny*, 158 Wis. 2d 474, 478, 463 N.W.2d 359, 361 (Ct. App. 1990). Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Section 802.08(2), Stats.

### A. Inverse Condemnation

Tuckaway claims that the City's refusal to approve the Project deprived it of all or substantially all of the property's beneficial use, thereby constituting a taking under Art. I, sec. 13, of the Wisconsin Constitution.[7] We disagree.

In a recent analysis of an inverse condemnation claim, we stated:

---

[7] Article I, sec. 13, of the Wisconsin Constitution provides: "The property of no person shall be taken for public use without just compensation therefor."

278

> In the absence of its physical occupancy or posses-
> sion, private property can be taken for public use
> only by state, county or municipal action which
> imposes a legally enforceable restriction on the use
> of the property. If a legally enforceable restriction is
> imposed on that use, then a taking occurs only if the
> restriction deprives the owner of all, or practically
> all, of the use.

*Reel Enters. v. City of La Crosse*, 146 Wis. 2d 662, 674, 431 N.W.2d 743, 749 (Ct. App. 1988). *See also Howell Plaza, Inc. v. State Highway Comm'n*, 92 Wis. 2d 74, 84-85, 284 N.W.2d 887, 892 (1979) (taking occurs where governmental agency places legal restriction upon property that practically or substantially renders the land useless for all reasonable purposes).

As an undisputed historical fact, no legally enforceable restriction was imposed on the property in question. As noted above, the delay associated with the petition process was not caused by the City. Further, Tuckaway has not made a *prima facie* showing that it has been deprived of all, or practically all, of the use to which its land can be put. Granted, its initial proposal has been denied. However, Tuckaway still has the opportunity to present revised plans for a project that conforms with the aesthetics of the surrounding neighborhood and is shown to be economically feasible. We conclude that there are no genuine issues of material fact as to Tuckaway's inverse condemnation claim and, therefore, affirm the trial court's order for summary judgment.[8]

---

[8] Tuckaway cites *Zinn v. State*, 112 Wis. 2d 417, 427-29, 334 N.W.2d 67, 72-72 (1983), for the proposition that even a tempo-rary taking supports an inverse condemnation claim. We agree. However, an individual arguing that a temporary taking has

## B. Breach of Contract

Tuckaway next claims that the City breached an implied agreement derived from the 1987 Amended Declaration of Restrictions — that Tuckaway would be permitted to build any reasonable project on the property that conformed to the modified density requirements. The trial court disagreed, basing its decision on the fact that the Amended Declaration plainly and unambiguously stated: "It is mutually agreed that this Amendment is complementary to the Planned Development Ordinance of the City and that the development hereinabove described is subject to the said ordinance." On appeal, Tuckaway argues that this statement is ambiguous and, therefore, summary judgment should not have been granted.

Contractual language is ambiguous only when it is "reasonably or fairly susceptible of more than one construction." *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990). Construction of a contract, including the determination of whether its terms are ambiguous, is a legal matter that we decide *de novo*. *Id.* Unambiguous contractual language must be enforced as it is written. *Dykstra v. Arthur G. McKee & Co.*, 92 Wis. 2d 17, 38, 284 N.W.2d 692, 702-03 (Ct. App. 1979), *aff'd*, 100 Wis. 2d 120, 301 N.W.2d 201 (1981). Further, we may not use the mechanism of construction to revise an unambiguous contract in order to relieve a party to a contract "from any disadvantageous

---

occurred must still meet the test that the government action in question "deprived the property owner of all or substantially all beneficial use of the property" for a period of time. *Id.* at 429, 334 N.W.2d at 73. Here, the undisputed facts do not meet this test and, therefore, *Zinn* is not applicable.

terms" to which he or she has agreed. *Id.* at 38, 284 N.W.2d at 703.

In the present case, we conclude that the language at issue in the 1987 Amended Declaration of Restrictions is unambiguous. The Amended Declaration clearly states that the development described is not only complementary to the Planned Development Ordinance, but is also subject to its terms. We conclude that this provision is reasonably susceptible of only one construction. Because the Declaration set forth its terms plainly and unambiguously, the trial court properly concluded that there were no issues of material fact surrounding a breach of any implied agreement between the parties and, accordingly, appropriately granted summary judgment in favor of the City.[9]

[9] Tuckaway argues in the alternative that Paragraph II of the Amended Declaration of Restrictions was breached by the City. Paragraph II states: "The City agrees to confirm that the Lands are zoned R-5 on the condition that the number of dwelling units constructed thereon shall not exceed 536 nor shall the density exceed 17 units per acre." Tuckaway claims that this provision barred the City from basing its refusal to approve a project based upon its proposed use or density so long as the project involved R-5 uses and a density of less than seventeen units per acre.

This contention is nothing more than a reflection of Tuckaway's failure to acknowledge that (1) the City never argued that the project density was improper, and (2) the City actually utilized other provisions of the planned unit development ordinance to reject the Project. Having previously concluded that aesthetic and economic feasibility were appropriate factors on which to base a rejection, and Tuckaway having presented no evidence that the Project was rejected based on the City's failure to comply with the density requirements as delineated in

## C. Tortious Interference With a Contract

Finally, Tuckaway claims the trial court erred in ruling that the immunity provisions of sec. 893.80(4), Stats., barred its tortious interference with a contract claim. Tuckaway argues that sec. 893.80(4) is not intended to afford governmental bodies immunity from their own intentional torts; rather, the statute provides immunity to governmental bodies for the intentional torts of its agents.

Section 893.80(4), Stats., reads:

> **893.80 Claims against governmental bodies or officers, agents or employes; notice of injury; limitation of damages and suits.**
>
> . . . .
> (4) No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employes nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employes for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

A plain reading of the statute indicates: (1) it provides immunity for governmental bodies in situations where their agents or employees commit intentional torts; and (2) it provides immunity for the agents or employees of governmental bodies where those individuals are acting within the exercise of a legislative, quasi-legislative, judicial or quasi-judicial function.

---

Paragraph II, Tuckaway's breach of contract claim fails as a matter of law.

Tuckaway claims the City itself, by its acts and omissions, interfered tortiously with the contractual relationship it had established with Tuckaway. Such interference, however, could not occur except through the actions of an official or agent of the City. Further, because the acts and omissions complained of occurred within the exercise of quasi-legislative or quasi-judicial actions, the agents and employees of the City who undertook those actions, as well as the City itself, are immune from suit as a matter of law. Therefore, summary judgment was properly granted in favor of the City.[10]

*By the Court.*—Judgment affirmed.

SCHUDSON, J. (*concurring*). The significance of footnote 4 of our decision merits added emphasis.

Essentially, Tuckaway claims that the City employed improperly motivated pretexts to postpone and deny its application. The City responds that it provided the required hearings, followed the correct procedures, rendered a legally tenable denial and, therefore, that Tuckaway has no cause of action for intentional denial of due process.

If, however, the City never intended to provide a decision on the merits and, as a result, its hearings and procedures were a sham, then neither formal compli-

---

[10] Tuckaway cites *Harmann v. Schulke*, 146 Wis. 2d 848, 852, 432 N.W.2d 671, 673 (Ct. App. 1988), for authority that sec. 893.80(4), Stats., does not provide immunity for misconduct that is "malicious, willful and intentional." We agree. However, we conclude as a matter of law that the City's conduct was not malicious, willful or intentional. Thus, *Harmann* is not applicable to the instant case.

ance with procedures nor theoretical tenability of a denial would make any difference. The trial court was correct in allowing Tuckaway to pursue that theory.

Therefore, if the trial court, in its summary judgments, had foreclosed Tuckaway's opportunity to attempt to prove that the City's procedures were pretextual and its decision-making process a sham, my conclusion in this case would have changed. Because, however, despite some troubling ambiguity in the reach of the summary judgments and the range of the resulting court trial, it appears that the trial court permitted Tuckaway to pursue its theory, and because, in footnote 4, we have recognized the viability of such a claim, I concur.