ALUMINUM INDUSTRIES CORPORATION, Plaintiff-
Respondent,

v.

CAMELOT TRAILS CONDOMINIUM CORPORATION,
Defendant-Appellant.†

Court of Appeals

*No. 94–0713. Oral argument March 30, 1995.—Decided May
9, 1995.*

(Also reported in 535 N.W.2d 74.)

†Petition to review granted.

574

For the defendant-appellant there were briefs and oral argument by *Jonathan B. Levine*, of Milwaukee.

For the plaintiff-respondent there were briefs by *Gaines Law Offices, S.C.*, with *Irving D. Gaines*, and *Jennine T. Sonntag*, of Milwaukee. There was oral argument by *Irving D. Gaines*

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J. Camelot Trails Condominium Corporation appeals from the trial court judgment granting summary judgment to Aluminum Industries Corporation.[1] Camelot argues that the trial court erred in granting summary judgment that permanently enjoined it from filing claims for condominium mainte-nance liens resulting from Aluminum's non-payment of condominium maintenance fees and assessments. Camelot also argues that the trial court erred in dis-missing its counterclaims for foreclosure on Aluminum's properties, and for condominium fees and assessments.

This case presents an issue of first impression: whether, under § 703.02(15), STATS., a condominium

---

[1] According to the notice of appeal, Camelot purports to also appeal from a supplementary judgment granting costs. We need not, however, address the costs judgment because Camelot included it in the notice of appeal as an appellate procedural formality and presents no substantive argument regarding that document.

property on which no construction has taken place is a "unit" subject to assessment for common expenses under § 703.16(2), STATS. We conclude that it is. In this case, however, we also conclude that, under § 703.16(2), STATS., the condominium declaration "otherwise provided" a definition of "unit" that precluded assessment of properties prior to construction. Therefore, although we depart from the trial court's statutory analysis in this case, we affirm.

Camelot is a non-profit association of residential condominium owners organized under the Condominium Ownership Act, Chapter 703 of the Wisconsin Statutes. The residential development involved in this case has 105 properties, ninety of which have completed duplexes or single family homes. Since 1986, Aluminum has been the owner of the other fifteen properties on which no dwellings have been constructed. An understanding of the history of the two stages of this condo development and how Aluminum came to be the owner of those fifteen properties is essential to the analysis of this case.

Aluminum Industries purchased land in Oak Creek and subsequently sold the land to a development corporation, Camelot Trails *Construction* Corporation, an entity distinct from the owners association involved in this case, Camelot Trails *Condominium* Corporation. The Construction Corporation planned to develop a condominium complex with sixty units under the original 1976 Declaration of Condominium, and an additional forty-five units in "phase two" under the 1980 First Amendment to the Declaration of Condominium. Aluminum Industries held a mortgage on the property and, as the developer sold condo units, Aluminum partially released condominiums from the mortgage.

577

Between 1976 and 1986, the developer built and sold ninety units in the condo complex. Sometime in 1986, however, the developer found itself financially unable to complete the fifteen remaining units and faced foreclosure. The developer then transferred the fifteen unbuilt properties by warranty deed to the mortgagor, Aluminum Industries, as a quid pro quo for Aluminum not to foreclose on the mortgage. Thus, on September 2, 1986, Aluminum became the owner of fifteen properties of the condo complex on which no construction had taken place.

The bylaws of the Camelot Trails Condominium Corporation (the owners' association) provide that the board of directors shall furnish the owner of each unit a written statement of the amount of assessment due for the owner's share in the common elements of the complex. In its factual summary, the trial court stated, "It became a custom which both parties have stated off the record[2] and apparently agree that fees were not assessed against units until the units were built and sold." Although at oral argument to this court Camelot indicated some lingering dispute in this regard, there is no dispute that between 1986 and 1992, Camelot never assessed Aluminum for any condominium association fees, and Aluminum never paid any association fees.[3] On August 19, 1992, however, counsel for Came-

---

[2] According to the undisputed comment by counsel for Camelot, the trial court and the parties had "been in Chambers for perhaps an hour discussing this in some detail," off the record, immediately preceding the trial court's statement of the factual summary and decision.

[3] Aluminum claimed that it never received notice of the meetings at which the owners' association set budgets and determined assessments. Camelot claimed that Aluminum failed to advise the owners' association of its ownership of the

lot wrote to the president of Aluminum, stating that Aluminum "should be paying, and should have been paying, Association fees" on the fifteen properties it owned.

Aluminum filed this action against Camelot seeking declaratory judgment and a permanent injunction "to restrain CAMELOT from recording or filing lien claims on the title to the real estate parcels . . . regarding any and all claims for common area fees on units not yet constructed, because such lien claims would be null and void and invalid." Aluminum claimed that "it would be equitably unjust" to pay the fees and that Camelot had no authority to seek payment prior to construction, completion, and transfer of residential dwelling units to third-party purchasers. Aluminum also claimed that any such assessments "are improper and contrary to the provisions of Wis. Stats. § 703.15(3) and (4) in that" it had received "no notice of any meeting . . . at which time budgets and assessments were adopted." Further, Aluminum claimed that due to the six-year delay, Camelot was estopped from seeking payment and Camelot's assessments were barred by the doctrine of laches.[4]

Camelot answered and counterclaimed for declaratory judgment "declaring Aluminum to be obligated to pay its proportionate share of common area expenses, past and future, in proportion to the percentage of Aluminum's undivided interest in the condominium's common elements, for each condominium unit owned by Aluminum," and for unpaid fees and charges of approximately $196,170 plus late charges and interest.

_____

fifteen properties. Our decision in this case, however, does not turn on any factual dispute or legal issue in this regard.

[4] Aluminum also alleged "slander of title" but did not pursue that claim in the trial court.

Aluminum replied, further asserting that Camelot's claims were "barred by the statute of limitations." Finally, Camelot amended its answer and counterclaims seeking an additional $26,505 plus interest for assessments and association fees for the period from August 1, 1991 through July 31, 1993, and further seeking a foreclosure judgment on the condominium liens and sale of Aluminum's fifteen properties.

Following its review of the pleadings, numerous affidavits, and briefs, the trial court correctly identified the "pivotal" issue in this case: whether, under § 703.02(15), Stats., and under the specific condominium declaration in this case, a condominium property was a "unit" subject to assessment prior to construction of a dwelling. The trial court concluded that a "unit" is "a constructed unit" and that Aluminum's "fifteen unbuilt units . . . are phantom units." The court explained, "[t]hey're unbuilt spaces of air and . . . as such they are dissimilar in nature with those types of units which are constructed for the purposes of assessment."[5] Therefore, the trial court granted summary judgment for Aluminum.

"Our review of an order granting summary judgment employs the same standards used by the trial court in its determination of the summary judgment motion." *Towne Realty, Inc. v. Edwards*, 156 Wis. 2d 344, 347, 456 N.W.2d 651, 652 (Ct. App. 1990). "When the pleadings, depositions, affidavits and other papers on file show that there is no genuine issue as to any material fact, the movant is entitled to judgment as a matter of law." *Id.; see* § 802.08(2), Stats. We review summary judgment *de novo. Towne Realty*, 156 Wis. 2d

---

[5] Resolving the issue on this legal basis, the trial court elected not to reach the equitable arguments.

at 347, 456 N.W.2d at 652. Further, application of a statute and interpretation of an unambiguous written agreement involve questions of law, which we independently review. *See Murphy v. Droessler*, 188 Wis. 2d 420, 425, 525 N.W.2d 117, 119 (Ct. App. 1994); *Old Tuckaway Assocs. Ltd. Partnership v. City of Greenfield*, 180 Wis. 2d 254, 282, 509 N.W.2d 323, 333 (Ct. App. 1993). We have carefully examined the evidentiary record in this case and conclude that although the trial court erroneously interpreted the statutory definition of a condominium "unit," it correctly concluded that the specific declaration for this condo development precluded assessments of unit owners prior to construction.

When property is duly executed and recorded under a declaration of condominium, it is subject to regulation under Chapter 703, Wisconsin's Condominium Ownership Act. Section 703.03, STATS. " 'Declaration' means the instrument by which a property becomes subject to this chapter, and that declaration as amended from time to time." Section 703.02(8), STATS. Section 703.16(2), STATS., provides:

> FUNDS FOR PAYMENT OF COMMON EXPENSES OBTAINED BY ASSESSMENTS. Funds for the payment of common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against the unit owners in proportion to their percentage interests in the common elements or as otherwise provided in the declaration.

Thus, Aluminum would be subject to assessment for its fifteen properties unless Aluminum does not become a "unit owner[ ]" prior to construction of a dwelling, or

unless non-assessment prior to construction is "otherwise provided in the declaration."

Section 703.02(17), STATS., defines "Unit owner'" as "a person, combination of persons, partnership or corporation who holds legal title to a condominium unit or has equitable ownership as a land contract vendee." Section 703.02(15), states that "Unit'" means:

> a part of a condominium intended for any type of independent use, including one or more cubicles of air at one or more levels of space or one or more rooms or enclosed spaces located on one or more floors (or parts thereof) in a building. A unit may include 2 or more noncontiguous areas.

We read nothing in the definitions of "unit owner" or "unit" to suggest their limitation to *constructed* units for purposes of assessment under § 703.16(2), STATS.[6] Indeed, the statute explicitly refers to "a part" that is

---

[6] The legislature apparently has recognized the problem with units described in condominium declarations that are not completed by enacting § 703.255, STATS., which provides:

**Noncompletion of units. (1)** A declarant who does not complete any unit described in the declaration within 5 years after recording the declaration under s. 703.07 shall do one of the following:

(a) Amend the declaration to remove the description of the uncompleted units and, notwithstanding the unit owner consent requirements of ss. 703.09(2) and 703.13(4), revise the percentage interests appurtenant to each unit and the number of votes appurtenant to each unit to adjust for the units removed.

(b) Secure a written agreement from at least 75% of the unit owners, not including the declarant, which permits the declarant to complete the uncompleted units within 5 years after the date of the written agreement and shall either complete the units within that time period or amend the declaration as provided in par. (a).

(2) Subsection (1) does not apply to expanding condominiums under s. 703.26.

(3) Subsection (1) does not eliminate any liability of a declarant under s. 703.24 or 703.25.

"intended for any type of independent use, including one or more cubicles of air." Clearly and unambiguously, therefore, that definition includes condominium land intended for construction but on which construction has not been started or completed.

Moreover, the apparent focus of § 703.16(2), STATS., is on "common expenses" and "interests in common elements" of a condominium development—expenses that are incurred by a condominium owners association and interests that are present for a condominium property owner regardless of whether construction has taken place on a particular property.[7] In this case, there is no dispute that the association fees assessed against owner-members of this associa-

---

The Legislative Council Note that follows § 9 of 1985 Senate Bill 274, which created § 703.255, STATS., states this section was being enacted because "it appears under current law [pre-§ 703.255] the declarant is required to pay the share of common expenses which, under the condominium declaration, are attributable to units which have not actually been completed." This section, however, is not applicable to the units at issue in this case because, according to § 703.38(11), STATS., § 703.255 "applies to condominiums created after December 31, 1986."

Interestingly, neither party mentions § 703.15(2)(e), STATS., which states, "The calculation of the percentage of common element interests conveyed to purchasers . . . shall be based on the percentage of undivided interest appertaining to each unit which has been conveyed assuming that all the units *to be completed* are included in the condominium." (Emphasis added.)

[7] Similarly, at the time the initial Declaration for this development was filed, § 703.10, STATS. (1975-1976), stated:

> The common profits of the property shall be distributed among, and the common expenses shall be charged to, the unit owners according to the percentage of the undivided interest in the common areas and facilities.

583

tion cover "common expenses and . . . creation of reserves for the payment of future common expenses," *see* § 703.16(2), STATS., and pay for a variety of facilities for all owners that, according to the declaration, included "land, roads, walks and driveways."

Aluminum argues that it should not pay assessment fees prior to construction because it does not yet enjoy the value of the common areas. We disagree. Every property owner shares an interest in and derives value from the maintenance and improvement of the "common elements." The fact that those values, enhanced by the improvements financed by the assessments, may be *more* fully enjoyed upon construction and residence or upon sale of the property certainly does not mean that the owner had no common interest prior to construction or sale.[8] As Camelot correctly points out, Aluminum's argument would render each

Effective August 1, 1978, former Chapter 703 was repealed and re-created by LAWS OF 1977, CH. 407, § 2. Section 703.16(2), STATS., is now the present-day statute applicable to this topic.

[8] Obviously, even if Aluminum never intended to build on the properties but only held them as an investment, their value to potential purchasers was enhanced by the maintenance and improvement of the areas. Further, if Aluminum could somehow establish that it had neither used nor enjoyed any of the common services or values, it still would be liable for association fees under § 703.16(3), STATS., which provides, in part:

> Liability for assessment may not be avoided by waiver of the use or enjoyment of any common element or by abandonment of the unit for which the assessments are made.

In its reply brief in opposition to Camelot's motion for summary judgment and in support of its own motion for summary judgment, Aluminum conceded: "This section [703.16(3)] does not apply to the present situation due to the fact that there has been no waiver of enjoyment of the common elements, nor has there been any abandonment."

owner's proportionate share "completely subject to building plans and sales success of the developer." Condominium development and owner's association budgeting would be economically chaotic, if not impossible. Camelot explains:

> If the owner of recorded but unbuilt units need not pay common expenses . . ., the first hapless purchaser of a constructed condominium unit in a new association must pay 100 percent of the common expenses because the declarant owner of the remaining units owes nothing. When the second unit is sold each new owner must pay 50 percent and when the third is sold, each must pay one-third, etc. . . . Each unit is to pay a proportionate share, with the denominator defined by the total number of units then subject to the declaration.

We note that although Wisconsin case law provides little if any guidance in this area, our conclusion is consistent with that reached in other states where courts have concluded that a developer who holds titles on uncompleted or unsold units is "a unit owner and thus subject to the same assessments as any other unit owner." *See Hatfield v. La Charmant Home Owners Ass'n, Inc.*, 469 N.E.2d 1218, 1221 (Ind. Ct. App. 1984) (citing *Brooks v. Palm Bay Towers Condominium Ass'n, Inc.*, 375 So. 2d 348 (Fla. Dist. Ct. App. 1979) (developer a "unit owner" obligated to pay proportionate share of common expenses)). We conclude that the statutory definition of "unit" encompasses a property on which there is no *constructed* unit.

Still, our analysis must continue. Section 703.16(2), STATS., does not necessarily require assessment of all units; it allows for different assessment

585

arrangements "as otherwise provided in the declaration." Thus, despite what otherwise would be Aluminum's liability for fees and assessments, Aluminum would be relieved of any such obligations if the specific declaration for this condominium provided that fees and assessments were only chargeable to constructed units. A careful examination of the declaration and amendment confirms the trial court's conclusion that the declaration and amendment did "otherwise provide" that properties would not be assessed prior to construction of dwelling units.

The original April 2, 1976 Declaration of Condominium includes numerous references that explicitly establish that "units" are dwellings distinct from the land. Section 1, "Description of Land," distinguishes "[t]he land which is the subject of this Declaration" from the "buildings and improvements" on the land. Section 2, "Description of Buildings," identifies the thirty-three buildings containing the original sixty units "in the process of construction or preconstruction upon the land" and specifically refers to these sixty "*dwelling units (hereinafter called 'units') in each building.*" (Emphasis added.) Section 2 further provides, "Each unit in each building has a separate heating system and separate meters for gas, electricity and water." Similarly, section 3, "Description of Units," confirms that the "units" of this declaration are "dwelling units," referring to floor plans, layouts, number of rooms, dimensions, and providing that "[t]he boundaries of each unit shall consist of that part of the cubic area of each building which is enclosed" by the walls, basement or garage floor, and roof.

These sections of the original declaration expressly and unambiguously establish that "units" are "dwelling units" distinct from the land itself. Still, there is

more. Section 11 of the original declaration, titled "Amendment to Declaration," provides that "[t]his Declaration may be amended" and that, under section 11(b), "[d]eclarant owns vacant land adjacent to this condominium." Section 11(b) continues:

Declarant presently intends that said land will be developed in one or more stages with a total of not in excess of 175 living units with boundaries and general design substantially similar to the units presently included in this Declaration. . . .Declarant reserves the absolute and unqualified right for Declarant and its successors and assigns on behalf of each unit owner of the condominium to amend this Declaration at any time and from time to time within seven years from date hereof *to add any part or all of said land and the living units constructed or under construction thereon to this condominium. In the event of any such addition, the percentage of interest for common area ownership, voting and other matters . . . for each of the units hereby created and the new units shall be equal based upon the total number of units and stated as the number one divided by the total number of units* then subject to this Declaration (e.g., 60 units at one-sixtieth (1/60th) each, 120 units at one-one hundred twenty (1/120) each, etc.).

Thus, the declaration expressly provides the potential for the addition of land to the condominium, and *also* provides the potential for the addition of "living units constructed or under construction" and for those "living units" to share their interest for common area ownership in proportion to "*the total number of units.*" Thus, although section 11(b) utilizes the term "living units" rather than "dwelling units," it continues the distinc-

tion between the land and the dwellings or living units to be constructed on the land.

On September 10, 1980, the Camelot Trails Condominium First Amendment to Declaration of Condominium (Phase II) was recorded. In its second paragraph, the amendment specifically refers to section 11(b) of the declaration and the right to amend the declaration "to add to the condominium any part or all of the land described in said section *and the units constructed or to be constructed thereon.*" The amendment then states, "Declarant now wishes to add a portion of the expansion land and 45 units (in 25 buildings) ('Phase II') to the condominium." Thus, the amendment continues to draw a distinction between the land and the dwelling units. Further, under "Description of Land" and "Description of Buildings," the amendment provides statements comparable to those in the original declaration and repeats the reference to *"condominium dwelling units (hereinafter called 'units') in each building."* (Emphasis added.) Clearly, the amendment creating what became Aluminum's fifteen properties maintained the original declaration's distinction between the land and the dwelling units.[9]

Camelot, however, points to additional provisions of the amendment:

---

[9] *See Country Oaks Condominium Management Comm. v. Jones,* 851 P.2d 640, 641-643 (Utah 1993) (undeveloped land not units so as to render owners liable for proportionate share of common expenses). *But see Mountain View Condominiums Homeowners Ass'n, Inc. v. Scott,* 883 P.2d 453, 456-457 (Ariz. Ct. App. 1994) (contract purchasers of condominium units had to pay assessments for common elements regardless of completion of units); *Bradley v. Mullenix,* 763 S.W.2d 272, 275-276 (Mo. Ct. App. 1988).

5. <u>Unit value for common area ownership and Voting</u>. The percentage of undivided interest in the common areas and facilities (including limited common areas) appertaining to each unit and its owner shall be one-one hundred fifth (1/105th) subject to decrease upon expansion of the condominium as provided in paragraph 11(b) of this Declaration.

Camelot argues that this reference to 1/105 necessarily or at least implicitly means that Aluminum's fifteen properties are subject to assessment regardless of construction. This section, however, explicitly relates not to how many properties will be assessed or when assessment can commence, but rather, to the proportionate share of each unit's interest in the common areas. Simply stated, under this section, even if construction on all 105 properties had been expected, and even if construction of dwelling units had taken place on only ninety of those properties, the amendment allows for each of the ninety dwelling unit owners to pay 1/105. Indeed, this arrangement addresses Camelot's concern about the proportional uncertainty that otherwise would exist. This arrangement protects prospective unit owners against the potentially chaotic condition that otherwise could come about if their proportional assessment depended on the extent of construction of dwellings on the new forty-five properties.

Camelot also points to the amendment's reference to "constructed, in the process of construction or in pre-construction phase upon the land" and argues that these words necessarily encompass properties without construction for purposes of defining "units" subject to assessment. Camelot, however, has wrenched these words from context. They appear in the "Description of

Buildings" and have nothing to do with the definition of "units" for purposes of assessment.

Thus, we conclude that the declaration and its amendment are wholly consistent and unequivocally establish that, under § 703.16(2), STATS., Camelot "otherwise provided" that its "unit owners" were not unit owners subject to assessment until construction of dwelling units on their properties. Accordingly, we affirm the trial court's grant of summary judgment.

*By the Court.*—Judgments affirmed.

FINE, J. (*dissenting*). Although I agree that the definition of "unit" in § 703.02(15), STATS., encompasses condominium property on which there has been no construction, I dissent because the condominium agreement does not shield the fifteen units owned by Aluminum Industries from the assessment required by § 703.16(2), STATS. Indeed, as the majority recognizes, the agreement burdens each unit with "1/105th" of the costs attributable to the common areas. Majority op. at 590. Yet, under the majority's analysis, fourteen percent (15 ÷ 105) of those costs cannot be collected from *anyone*. This is a bizarre result and is contrary to both the language and the obvious intent of the condominium agreement.