FULMER, Judge.
In this appeal, we are asked to determine whether the developer of a non-phased condominium project is required to fund reserves for the maintenance of condominium units that had not yet been constructed at the time that control of the condominium association was turned over from the developer to the association. We conclude that the developer is not required to fund maintenance reserves for unbuilt units and, therefore, reverse the summary judgment entered in favor of Fairway Gardens at Tara Condominium Association, Inc.
Tara Manatee, Inc. (Developer) was the developer of a twenty-building, eighty-unit condominium project in Manatee County that is now operated by Fairway Gardens at Tara Condominium Association, Inc. (Association). Prior to turnover of control of the association, the Developer was operating under the developer guarantee provision of section 718.116(9)(a)(2), Florida Statutes (1995), which states in relevant part:
A developer ... who owns condominium units ... may be excused from the payment of his share of the common expense which would have been assessed against those units during the period of time that he has guaranteed to each purchaser in the purchase contract, declaration, or prospectus ... that the assessment for common expenses of the condominium imposed upon the unit owners would not increase over a stated dollar amount and has obligated himself to pay any amount of common expenses incurred during that period and not produced by the assessments at the guaranteed level receivable from other unit owners.
The premise of the developer guarantee provision is that a developer should be excused from paying assessments on its units during the initial sales phase when its units are typically unsold and, thus, not consuming services of the association. Joseph E. Adams, Community Associations: 1998 Survey of Florida Law, 23 Nova L.Rev. 65, 75 (1998). Otherwise, the developer would bear a disproportionate burden in the maintenance of the condominium. Id. However, the developer must guarantee that assessments against nonde-veloper unit owners will not exceed a stated dollar amount and the developer must also agree to fund any deficit incurred in the operation of the condominium (includ *34 ing funding of reserves, unless properly waived) during the guarantee period. Id.
In this case, the Developer contended that there was no deficit at turnover. However, the Association contended that there was a deficit of $44,009 because the Developer failed to fund maintenance reserves for the units that had not yet been built. The Developer refused to pay the $44,009 and sought a declaratory judgment interpreting its obligations under the Declaration of Condominium and applicable statutes. The Association answered and filed a counterclaim seeking a money judgment for $44,009. Both parties filed motions for summary judgment. The trial court granted the Association’s motion and entered a final judgment in the amount of $52,794.77, which represented the Association’s claim for $44,009 plus prejudgment interest.
At the summary judgment hearing the Association argued that when the Declaration of Condominium was recorded the Developer became obligated to fund reserves for the maintenance of all eighty proposed units. In support, the Association first cited section 718.104(2), Florida Statutes (1995), which provides that “[u]pon the recording of the declaration ... all units described in the declaration ... as being located in or on the land then being submitted to condominium ownership shall come into existence, regardless of the state of completion of planned improvements in which the units may be located.”
Next, the Association cited section 718.112(2)(f)(2), which contains a requirement that the annual budget of common expenses include reserve accounts for capital expenditures and deferred maintenance. The same subsection provides that “prior to turnover of control of an association ... the developer may vote to waive the reserves or reduce the funding of reserves for the first 2 years.” § 718.112(2)(f)(2). The Association argued that the Developer was obligated to fund maintenance reserves for all eighty units described in the declaration because the units came into existence when the declaration was recorded and the Developer did not vote to waive or reduce the reserves. Finally, the Association acknowledged that the condominium was being operated under a developer guarantee authorized by section 718.116(9)(a)(2) and asserted that the Developer’s obligation under this provision included funding reserves for un-built units because maintenance reserves are a common expense incurred upon the recording of the declaration. And, if the Developer did not wish to fund these reserves, it should have built a phased condominium or should have voted to waive or reduce the reserves.
The Developer agreed that its unbuilt units came into existence when the declaration was recorded, and therefore, all proposed units were subject to assessments as they became due for the maintenance of common elements and built units. The Developer also agreed that as part of the developer guarantee it was obligated to ensure that reserves for constructed units and common elements such as the pool and roads were fully funded. However, with respect to reserves for deferred maintenance, the Developer argued that it was only .obligated to fund reserves for the maintenance of constructed buildings and common elements.
On appeal, the Developer frames the issue as whether maintenance reserves for unbuilt units are an “incurred” common expense for which the Developer is liable under the developer guarantee provision. The determination of whether these reserves are an incurred common expense turns on a determination of what event triggers the requirement that they be *35 funded. The trial court cited Hyde Park Condominium Ass’n v. Estero Island Real Estate, Inc., 486 So.2d 1 (Fla. 2d DCA 1986), and concluded that the Developer became obligated to fund full reserves for all eighty units at the time the declaration was recorded because at that time “the eighty units came into existence.” While we agree that the units came into legal existence upon the recording of the declaration, we do not agree that the obligation to fund deferred maintenance reserves for the unbuilt units also arose at that time.
In Hyde Park, the Hyde Park Condominium Association filed suit against the owners of Units Dl-7 for failure to pay assessments for common expenses. 486 So.2d at 2. The owners denied responsibility for paying assessments because the property owned consisted of lots rather than constructed units. Id. The trial court found that lots 1-7 of Unit D were unimproved property and were not “units” subject to assessments. Id. This court reversed. Id. We noted that the Hyde Park Condominium declaration provided that all units were liable for a proportionate share of the common expenses in the same proportion as such units share in the common elements. Id. We concluded that the unimproved lots were units:
Under the 1969 Act, condominium property includes land, all improvements, all improvements on the land, and all easements and rights with the condominium. § 711.03(9) [Fla. Stat. (1969)]. A “unit” is that part of the condominium property “which is to be subject to private ownership.”
§ 711.03(13)(emphasis added). “Common elements” are defined as “portions of the condominium property not included in the units.” § 711.03(4)(emphasis added). Therefore, under the 1969 Act, the only type of private ownership available within a condominium is a “unit.”
Id. Hyde Park stands for the proposition that all units, whether built or unbuilt, must share in assessments for common expenses of the condominium. For example, if only five units are constructed and sold in a fifty-unit condominium, assessments for the expense of maintaining the roads, landscaping, and common elements, such as a pool, would be levied against all fifty units and not just the five that were already constructed.[1] Hyde Park does not stand for the proposition that deferred maintenance reserves for unbuilt units become an incurred common expense at the time a declaration is recorded and, therefore, does not support the trial court’s order in this case.
We conclude that the requirement to fund reserves for deferred maintenance is not triggered by the recording of a declaration of condominium. We reach this conclusion by construing section 718.112(2)(f), which addresses what must be included in an annual budget, and more specifically subsection 718.112(2)(f)(2), which addresses reserve accounts. This subsection provides in part:
In addition to annual operating expenses, the budget shall include reserve accounts for capital expenditures and deferred maintenance. These accounts shall include, but are not limited to, roof replacement, building painting, and pavement resurfacing, regardless of the amount of deferred maintenance expense or replacement cost, and for any other item for which the deferred maintenance expense or replacement cost exceeds $10,000. The amount to be re *36 served shall be computed by means of a formula which is based upon estimated remaining useful life and estimated replacement cost or deferred maintenance expense of each reserve item. The association may adjust replacement reserve assessments annually to take into account any changes in estimates or extension of the useful life of a reserve item caused by deferred maintenance. This subsection does not apply to budgets in which the members of an association have, by a majority vote at a duly called meeting of the association, determined for a fiscal year to provide no reserves or reserves less adequate than required by this subsection. However, prior to turnover of control of an association by a developer to unit owners other than a developer pursuant to s. 718.301, the developer may vote to waive the reserves or reduce the funding of reserves for the first 2 years of the operation of the association, after which time reserves may only be waived or reduced upon the vote of a majority of all nonde-veloper voting interests voting in person or by limited proxy at a duly called meeting of the association.
§ 718.112(2)(f)(2).
We conclude that, based on the wording of this statute, a developer is not required to fund deferred maintenance reserves for unbuilt units. The formula prescribed to determine amounts to be reserved is based in part on the “remaining useful life” of each reserve item. The phrase “remaining useful life” suggests that the “useful life” of an improvement has already begun. The useful life of a unit in terms of maintenance does not commence until it is built because unbuilt units do not deteriorate and accrue maintenance needs. Furthermore, the provisions of section 718.112(2)(f)(2) whereby a developer may vote to waive or reduce the funding of reserves must be read to apply only to reserves that are required to be funded. We find no requirement to fund maintenance reserves for unbuilt units and, therefore, no waiver was necessary.
Accordingly, we reverse the summary judgment entered in favor of the Association and direct the trial court to enter summary judgment in favor of the Developer.
Reversed and remanded.
SALCINES and CANADY, JJ„ Concur.

. Developers are permitted to close on completed units within each substantially completed building in a condominium development, provided the common facilities serving the completed units have been substantially completed. § 718.104(4)(e), Fla. Stat. (1995).