2022 IL App (2d) 210440-U
No. 2-21-0440
Order filed May 9, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| FREDRIC J. HOLTGREN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-MR-1156 |
| | ) | |
| 260 JAMIE LANE CONDOMINIUM | ) | |
| ASSOCIATION and UNKNOWN OFFICERS | ) | |
| AND DIRECTORS, | ) | Honorable |
| | ) | Mitchell L. Hoffman, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Zenoff and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in granting defendants' motion to dismiss plaintiff's second amended complaint for failure to state a claim for declaratory relief from imposition of assessments on four undeveloped condominium units. Affirmed.

¶ 2   Plaintiff, Fredric J. Holtgren, sued defendants, 260 Jamie Lane Condominium Association and unknown officers and directors (collectively the association), for a declaratory judgment that he was not liable for assessments on four undeveloped condominium units that he owned. The trial court granted the association's motion to dismiss the operative complaint with prejudice. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Holtgren is a real estate developer. In early 2001, as the owner and developer of the subject property, Holtgren drafted, executed, and recorded an "Easements, Restrictions And Covenants For 260 Jamie Lane Condominiums And Declaration Of By-Laws For The 260 Jamie Lane Condominium Association" (declaration) pursuant to the provisions of the Condominium Property Act (Act) (765 ILCS 605/1 *et seq.* (West 2018)). We recount the relevant portions of the Act and declaration as well as the procedural history.

¶ 5                              A. Act and Declaration

¶ 6      The Act provides for the submission of a property to its provisions by "recording a declaration, duly executed and acknowledged, expressly stating such intent and setting forth the particulars enumerated in Section 4 [specifying the requisite content of the declaration]." *Id.* § 4. Any provisions in the declaration that are inconsistent with the Act "are void as against public policy and ineffective." *Id.* § 2.1. In accordance with the statutory requirements, the declaration here sets forth the legal description of the property, commonly known as 260 Jamie Lane, located in an industrial area of Wauconda. The declaration further provides that the property is "improved with a nine (9) unit commercial/industrial building." The intent of the declaration is set forth in sections B, C, and D of the recitals, respectively, as follows:

> B.      "The Owner desires and intends by this Declaration to submit the Property (as herein defined) to the provisions of the Condominium Property Act of the State of Illinois, as amended from time to time,
>
> C.      The Owner further desires and intends, by this Declaration, to establish for its own benefit and for the benefit of all future owners and occupants of the Property, and each part thereof, certain easements and rights in, over and upon the Property and certain

mutually beneficial restrictions and obligations with respect to the use and maintenance thereof,

D.      The Owner desires and intends, by this Declaration, to declare that the owners, mortgagees, occupants and other persons acquiring any interest in the Property shall, at all times, enjoy the benefits of and shall, at all times, hold their interests subject to the rights, easements, privileges and restrictions hereinafter set forth all of which are declared to be in furtherance of a plan to promote and protect the cooperative aspect of ownership, and to facilitate the proper administration of the Property and are established for the purpose of enhancing and perfecting the value, desirability and attractiveness of the Property."

¶ 7      Article I of the declaration, entitled "Definitions," sets forth definitions of "unit," "unit owner," "common elements," and "common expenses." "Unit" means "a part of the property designated and intended for any type of independent use." A "unit owner" is defined as "the person or persons whose estates or interests individually or collectively, aggregate fee simple absolute ownership of a Unit." "Common elements" means "all portions of the Property, except the units, including the Limited Common Elements [those designated in the declaration or plat of survey as being reserved for the use of a certain unit or units to the exclusion of other units]." And "common expenses" means "the proposed or actual expenses affecting the property, including reserves, if any, lawfully assessed by the Board."

¶ 8      These definitions are essentially synonymous with the definitions set forth in the Act (765 ILCS 605/2(d), (e), (g), and (m) (West 2018)), although the definition of unit in the Act is "a part of the property *designed* [rather than "designated" as used in the declaration's definition] and intended for any type of independent use" (see *id.* § 2(d)). The declaration identifies the following

common expenses: "[s]now plowing, lawn mowing, landscape maintenance, fire alarm phone line and monitoring board at the Police Station, monthly electric charges for sprinkler rooms, sprinkler and domestic annual backflow certification."

¶ 9    Article II of the declaration, entitled "Units," provides a description of the units. Namely, section A of article II provides that "[a]ll units are delineated" on the plat of survey attached as exhibit A to the declaration and listed in exhibit B to the declaration and that "[e]ach unit consists of the space enclosed and bounded by the horizontal and vertical planes set forth in the delineation thereof ***" on the plat of survey. Exhibit A—the plat of survey—depicts the division of the property into nine condominium units (identified as units A through I) and demarcates each of the nine units' dimensions, boundaries, and geographic locations on the property. Units A, B, C, D, and E are located on what is identified as lot 14, and units F, G, H, and I are located on what is identified as lot 1 (and adjacent to what is identified as the south line of lot 2). There is a notation on the plat of survey: "Partial Building Under Construction On Parcel A Thru E Is Not Shown Hereon." There are also notations setting forth the floor and ceiling elevations of units A through E and the floor and ceiling elevations of units F through I.

¶ 10    Exhibit B is an inventory of the condominium units. It states that the total square footage of the land is 89,540, the total square footage of the building is 34,760, and the total square footage of the common elements is 54,780. Exhibit B also lists, in table form, each of the nine identified units and sets forth their respective square footage in the building and calculated percentage of the total unit ownership of the building and common elements, as follows:

Unit A: 5000 square feet; 14.38% ownership

Unit B: 4880 square feet; 14.06% ownership

Unit C: 5000 square feet; 14.38% ownership

Unit D: 2500 square feet; 7.19% ownership

Unit E: 2500 square feet; 7.19% ownership

Unit F: 2500 square feet; 7.19% ownership

Unit G: 2380 square feet; 6.85% ownership

Unit H: 5000 square feet; 14.38% ownership

Unit I: 5000 square feet; 14.38% ownership

The square footage of the units totals 34,760 (the stated total square footage of the building); the percentages total 100%. Exhibit B states that the percentages "will be used for General repairs of building, common areas and taxing purposes."

¶ 11     Regarding payment of assessments, article V, section A of the declaration provides: "Each Unit Owner shall pay his proportionate share of the Common Expenses *** in the same ratio as his percentage of ownership interest in the Common Elements ***. If any Unit Owner shall fail or refuse to make any such payment of the Common Expenses when due, the amount thereof shall constitute a lien on the Unit Ownership of such Unit Owner as provided in the Act."

¶ 12     The Act, in turn, provides:

> "All common expenses incurred or accrued prior to the first conveyance of a unit shall be paid by the developer, and during this period no common expense assessment shall be payable to the association. It shall be the duty of each unit owner *including the developer* to pay his proportionate share of the common expenses commencing with the first conveyance. The proportionate share shall be in the same ratio as his percentage of ownership in the common elements set forth in the declaration." (Emphasis added.) 765 ILCS 605/9(a) (West 2018).

In the event a unit owner fails or refuses to pay the common expenses or any unpaid fine when due, "the amount thereof together with any interest, late charges, reasonable attorney fees incurred enforcing the covenants of the condominium instruments, rules and regulations of the board of managers, or any applicable statute or ordinance, and costs of collections shall constitute a lien on the interest of the unit owner in the property ***." *Id.* § 9(g).

¶ 13    The declaration specifies in section I of article XV that assessments are payable even if the unit owner does not use or abandons the unit: "No Unit Owner may waive or otherwise escape liability for the assessments provided herein by non-use of the Common Elements or abandonment of his Unit." Moreover, as set forth in section H of article XV, the association has "no authority to forebear the payment of assessments by any Unit Owner."

¶ 14    Holtgren sold units A, B, C, D, and E, and in June 2001, executed and recorded an amendment to the declaration. The recitals to the amendment provide, *inter alia*:

> "WHEREAS, certain unit dimensions as set forth on the survey attached to the Declaration were subject to change;
>
> WHEREAS, said dimensions for the constructed building on Lot 14 are now permanent and not subject to change, however, the dimensions for the building to be placed on Lot 1 and a portion of Lot 2, as shown on the Plat, are proposed and subject to change."

¶ 15    Accordingly, "[t]he plat attached to the declaration showing, delineating and describing the units contained therein is hereby amended by Exhibit A attached hereto delineating and describing the units contained on Lot 14 and the proposed units for the building to be constructed on Lot l and a portion of Lot 2 therein in compliance with Section 5 of the Condominium Property Act [765 ILCS 605/5 (West 2018), entitled "Plat to be recorded"]." The attached amended plat of survey continues to depict the division of the property into nine condominium units (identified as

units A through I) with Units A, B, C, D, and E located on what is identified as lot 14, and units F, G, H, and I located on what is identified as lot 1 (and adjacent to what is identified as the south line of lot 2). Lot 14 contains the notation "Multi-Unit Masonry Building"; Lot 1 contains the notation "Future Building." The amendment to the declaration concludes that, "[e]xcept as expressly set forth herein, the declaration shall remain in full force and effect in accordance with its terms."

¶ 16    Holtgren continues to own units F, G, H, and I, and lot 1 remains an undeveloped, vacant lot. At some point, although the precise date is not reflected in the record, the association began to levy assessments against Holtgren for units F, G, H, and I. Following Holtgren's refusal to pay assessments on the units, the association recorded a lien against the property. As a result of the lien, Holtgren's attempts to sell the four remaining units have been unsuccessful.

¶ 17                                    B. Trial Court Proceedings

¶ 18    Holtgren initiated this lawsuit on December 9, 2019. After two rounds of successful motions to dismiss, Holtgren was granted leave to file the operative complaint—a second amended complaint for a declaratory judgment pursuant to section 2-701 of the Code of Civil Procedure (735 ILCS 5/2-701 (West 2018)). Citing the relevant portions of the declaration and amendment to the declaration, Holtgren alleged that the lot remains vacant and undeveloped and that, unlike units A, B, C, D, and E, the square footage and percentage of ownership for his units F, G, H, and I are subject to change. Holtgren further alleged that he receives no benefit from the lot. According to Holtgren, the association has levied assessments against him "for a number of years," and the lien is for a "sum of money which in [his] opinion, far exceeds the value of the subject property." Thus, Holtgren sought a declaratory judgment that no assessment is due on lot 1, that the intent of

the declaration was to create an assessment for improved real estate only, and that the lien against the property has no force or effect and amounts to a slander of title.

¶ 19    On June 3, 2021, the association moved to dismiss the second amended complaint with prejudice for failure to state a claim pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)). The association argued, *inter alia*, that the definition of unit in the Act and declaration is unambiguous as to its inclusion of both developed and undeveloped condominium units and that nothing in the declaration excluded undeveloped units from assessment payments. In response to the motion to dismiss, Holtgren argued, *inter alia*, that "unit" is ambiguous and that the entirety of the declaration, plat, and amended plat, considered together, demonstrate that his four undeveloped units should not be subject to assessments.

¶ 20    Following briefing and argument, on August 4, 2021, the trial court granted the association's motion to dismiss the second amended complaint with prejudice. The record does not include a transcript of the proceeding. In its written order, the trial court found that: (1) the declaration "is not ambiguous with respect to the definition of a 'unit' in the Condominium"; (2) the declaration "nowhere distinguishes between improved and unimproved Condominium units"; (3) "the definition of 'unit' as set forth in the Declaration nowhere requires or prescribes a present use, or a particular use, as a precondition or qualification for status as a 'unit' in the Condominium"; (4) "[t]he Declaration states expressly that non-use of a Condominium unit does not waive or exempt a unit owner from the obligation to pay assessments"; and (5) "[t]he units designated 'F,' 'G,' 'H' and 'I' in the Declaration are Condominium 'units' for all purposes under the Declaration and the [Act]."

¶ 21    Holtgren timely appealed.

¶ 22                                II. ANALYSIS

¶ 23 Holtgren argues that the trial court erred in dismissing the second amended complaint because he stated a claim for declaratory relief from imposition of assessments on the four undeveloped units. According to Holtgren, the definition of a unit in the declaration is ambiguous and was not intended to include vacant land. Rather, Holtgren contends that the property must be developed with a structure to be considered a unit subject to assessments. We disagree, as set forth below.

¶ 24 The trial court granted the association's motion to dismiss the second amended complaint pursuant to section 2-615. A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint. 735 ILCS 5/2-615 (West 2020). *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11. In ruling on the motion, the trial court must accept as true all well-pled facts, as well as any reasonable inferences that may arise from them. *Id.* "The essential question is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Id.* We review *de novo* an order granting a section 2-615 motion to dismiss. *Id.*

¶ 25 Resolution of whether Holtgren's undeveloped units are subject to assessments requires interpretation of the Act and the declaration. We must examine any relevant provisions in the Act and the declaration and construe them as a whole. See *V & T Investment Corp. v. West Columbia Place Condominium Ass'n*, 2018 IL App (1st) 170436, ¶ 22; *Carney v. Donley*, 261 Ill. App. 3d 1002, 1008 (1994). Principles of statutory construction guide the analysis. *V & T Investment Corp.*, 2018 IL App (1st) 170436, ¶ 22; see also *Toepper v. Brookwood Country Club Road Ass'n*, 204 Ill. App. 3d 479, 487 (1990) (applying similar rules of contract construction to the interpretation of a condominium declaration).

¶ 26    The fundamental objective of statutory construction is to ascertain and give effect to the legislature's intent. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 21. The best indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *Id.* Each word, clause, and sentence of a statute must be given a reasonable construction, and no term should be rendered superfluous. *Id.* A court will not depart from the plain language by reading in exceptions, limitations, or conditions not expressed therein. *Siena at Old Orchard Condominium Ass'n v. Siena at Old Orchard, LLC*, 2017 IL App (1st) 151846, ¶ 67. Statutes must be construed to avoid absurd or unjust results. *Richards v. Vaca*, 2021 IL App (2d) 210270, ¶ 11. Like the review of a section 2-615 dismissal, we review *de novo* questions of statutory interpretation. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21.

¶ 27    The parties' arguments turn on the interpretation of "unit"—defined in the Act as "a part of the property *designed* and intended for any type of independent use" (see 765 ILCS 605/2(d) (West 2018)), and defined in article I of the declaration as "a part of the property *designated* and intended for any type of independent use." (Emphases added.) Neither party argues that the distinction in the verbiage impacts the resolution; indeed; the parties do not acknowledge the distinction. Ultimately, the distinction is without a difference in our analysis, as a review of the declaration demonstrates that all nine units, including Holtgren's units F, G, H, and I, are explicitly designed or designated and intended for independent use.

¶ 28    Regarding the design or designation of the units, the declaration divides the condominium property into nine condominium units and their concomitant apportionment of common elements. All nine units are identified in the plat and amended plat of survey with precise boundaries and geographic locations on the property. In addition, the inventory of the condominium units lists

each of the identified units with their respective square footage and calculated percentage of the common elements.

¶ 29    All nine units are also unequivocally intended for independent use. The express statement of intent set forth in the declaration provides that the owner "desires and intends by this Declaration" to submit the property to the Act and to declare that future owners shall enjoy the benefits of and hold their interests subject to the stated rights and restrictions in furtherance of a plan to promote and protect the cooperative ownership and enhance the value of the property. Holtgren contends that there can be no independent use of his units F, G, H, and I, because there is no building on the vacant land. This argument misses the point. The question is the *intended* use of the property. The *intention* that portions of the property be for independent use was set forth in the declaration. Specifically, the declaration identified all nine units (improved and unimproved) as "units," granted all nine units identical rights and obligations, and assigned all nine units unique identifiers, square footages, and percentages of common elements.

¶ 30    Holtgren maintains that the definition of a unit is ambiguous given the entirety of the declaration and amended declaration. He points to section A of article II of the declaration, providing that "[e]ach unit consists of the space enclosed and bounded by the horizontal and vertical planes set forth in the delineation thereof" on the attached plat of survey. Holtgren argues that a vacant lot cannot be enclosed and bounded by horizontal and vertical planes. He also argues that the statement in the recital to the declaration's amendment—that the dimensions for the unimproved units are subject to change—amplifies the ambiguity. We disagree that the definition of unit is ambiguous and further note that any purported ambiguity would be resolved against Holtgren, as the drafter of the declaration. See *Sherwood Commons Townhome Owners Ass'n v. Dubois*, 2020 IL App (3d) 180561, ¶ 31.

¶ 31    Preliminarily, without citation to authority, the association argues that the recital in the declaration's amendment has no operational effect (although it did not raise the same challenge to reliance upon the intent recitals in the initial declaration). The association is correct that "[r]ecitals to a contract provide explanations of the circumstances surrounding the execution of the contract but are not generally binding on the parties and are not an effective part of their agreement unless referred to in the operative portion of the agreement." *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 109; see also *Toepper*, 204 Ill. App. 3d at 489 (declining to resolve whether recitals in a developer agreement were binding where the language in the recitals did not resolve the central issue of whether the developer rights were assignable). That being said, recitals reflect the parties' intention and create a context through which the operational portion of the document can be better understood. *Hagene v. Derek Polling Construction*, 388 Ill. App. 3d 380, 385 (2009). Ultimately, the argument is merely academic here, because the language upon which Holtgren relies does not render the definition of a unit ambiguous in any event.

¶ 32    The undisputed intent of the declaration was to submit the property to the Act and the attendant rights and restrictions of cooperative ownership in a condominium unit. Units F, G, H, and I are defined in the declaration, delineated on the plat of survey, and listed in the inventory. The provision that "[e]ach unit consists of the space enclosed and bounded by the horizontal and vertical planes" and the ability to change the dimensions of the unimproved units in no way impacts the clear designation or design and intention for independent use of the parcels. Indeed, Holtgren's position is illogical. If the unimproved units were not in fact units, then there would have been no reason to identify and itemize them in the manner set forth in the declaration.

¶ 33    Moreover, there is no provision anywhere in the declaration stating that the construction of an improvement to the property is a condition precedent to unit status. The declaration does not

specify or limit the physical character of a unit. We cannot read into the declaration a limitation or condition not expressed therein. See *Siena at Old Orchard Condominium Ass'n*, 2017 IL App (1st) 151846, ¶ 67. It is the straightforward definition of unit set forth in the Act and declaration—a part of the property designed or designated and intended for independent use—that dictates our holding that Holtgren's undeveloped units are subject to assessments.

¶ 34    Holtgren persists in arguing the unfairness of being assessed as if there were a "15,000 square foot building" on the lot (the total square footage of Holtgren's units F, G, H, and I is 14,880), notwithstanding that he receives no benefit from the undeveloped units. However, the declaration expressly provides in section I of article XV that nonuse or abandonment of the unit does *not* exempt a unit owner from liability for assessments. In addition, the common expenses identified in the declaration includes exterior maintenance of the lots—a value even for undeveloped units. There is simply nothing in either the Act or declaration that allows Holtgren to escape liability for assessments based upon his own nondevelopment of the units.

¶ 35    We further note that, according to the ownership percentages set forth in the inventory of units attached as exhibit B to the declaration, the proportionate shares of assessments for Holtgren's units F, G, H, and I are 7.19%, 6.85%, 14.38%, and 14.38%, respectively, totaling 42.8%—almost half of the proportionate shares. Holtgren offers no explanation for who would be responsible to cover that percentage of assessments, if not him. There is nothing in the Act or the declaration to suggest that the other unit owners could be saddled with the additional percentage of assessments in the event of nondevelopment of the remaining units. In fact, section 4(e) of the Act provides that the percentage of ownership interest in the common elements allocated to each unit in the declaration "shall remain constant unless otherwise provided in this Act or thereafter changed *by agreement of all unit owners.*" (Emphasis added.) 765 ILCS 605/4(e) (West 2018); see

*Huskey v. Board of Managers of Condominiums of Edelweiss, Inc.*, 297 Ill. App. 3d 292, 295-96 (1998) ("Common interest ownership goes to the essence of an owner's property interest in the condominium. The percentage of common interest ownership impacts the unit's owner's property taxes, the amount of annual and special assessments, as well as the resale price of the unit.").

¶ 36     In this regard, we note that the initial declaration contemplated one building with nine units, while the amendment to the declaration contemplated two buildings—with five units in the constructed building on lot 14, and four units in the building to be constructed on lot 1. Neither party acknowledges or addresses this distinction. Regardless, while the amendment provided that the dimensions of the building to be constructed on lot 1 were subject to change, the amendment did nothing to change the overall calculation of ownership percentages explicitly set forth in exhibit B to the declaration. To the contrary, the amendment explicitly provided that, "[e]xcept as expressly set forth herein, the declaration shall remain in full force and effect in accordance with its terms."

¶ 37     Holtgren cites cases from other jurisdictions to support his position that undeveloped condominium units are not subject to assessments. See, *e.g.*, *SE Property Holdings, LLC v. Rookery III*, No. 11-0629-WS-B, 2013 WL 69030, at *10-11 (S.D. Ala. Jan. 3, 2013) (statute defining unit as " '[a] physical portion of the condominium designated for separate ownership or occupancy' " did not exempt unbuilt units yet allowed for a modified definition in the declaration; the declaration defined unit as having boundaries consisting of " 'innermost planes of the interior finished surfaces' "); *Tara Manatee, Inc. v. Fairway Gardens at Tara Condominium Ass'n*, 870 So. 2d 32, 36 (Fla. Ct. App. 2003) (holding that a developer was not required to fund deferred maintenance reserves for unbuilt condominium units, where the Florida statute addressing reserve accounts set forth a formula based upon the remaining "useful life" of each item).

¶ 38    Ultimately, a review of the jurisprudence reflects that the determination of whether an undeveloped unit is subject to assessments hinges on the respective statutory language and provisions in the declaration. See 15B Am. Jur. 2d Condominiums § 33 ("Whether an unbuilt unit in a condominium is subject to the general assessment for common expenses depends generally on the particular declaration controlling the condominium."); see also *Buchholz v. Waterville Estates Ass'n*, 934 A.2d 511, 513, 516 (N.H. 2007) (holding that the association was authorized to collect association dues and assessments from tax sale purchaser of unimproved lot in condominium development); *Aluminum Industries Corp. v. Camelot Trails Condominium Corp.*, 535 N.W.2d 74, 78 (Wis. Ct. App. 1995) (reasoning that the statutory definition of unit included condominium land on which construction had not yet begun).

¶ 39    The Wisconsin Appellate Court's decision in *Aluminum Industries* is illustrative. The issue in *Aluminum Industries* was whether a condominium property on which no construction had taken place was a unit subject to assessment for common expenses under the Wisconsin Condominium Ownership Act (Wisconsin Act) (Wis. Stat. §§ 703.02(15) and (17), 703.16(2)). *Aluminum Industries*, 535 N.W.2d at 75. The trial court granted summary judgment in favor of the owner (and successor-in-interest to the developer) of the undeveloped condominium property on its claims for a declaratory judgment and permanent injunction to restrain the condominium association from placing liens on the property due to the owner's nonpayment of assessments. *Id.* at 77. The trial court reasoned that a unit is " 'a constructed unit' " and that the owner's " 'fifteen unbuilt units *** are phantom units.' " *Id.* The trial court further explained that " '[t]hey're unbuilt spaces of air and *** as such they are dissimilar in nature with those types of units which are constructed for the purposes of assessment.' " *Id.*

¶ 40    While the appellate court affirmed summary judgment in the owner's favor, it did so on other grounds and explicitly disagreed with the trial court's rationale. *Id.* Turning to the relevant statutory provisions, the appellate court noted that a unit was defined as " 'a part of a condominium intended for any type of independent use, including one or more cubicles of air at one or more levels of space or one or more rooms or enclosed spaces located on one or more floors, or parts thereof, in a building. A unit may include 2 or more noncontiguous areas.' " *Id.* (quoting Wis. Stats. § 703.02(15)). Given the lack of any language limiting the definition's application to constructed units, the court reasoned that, "[c]learly and unambiguously, therefore, that definition includes condominium land intended for construction but on which construction has not been started or completed." *Id.* at 78. Accordingly, the court concluded that "the statutory definition of 'unit' encompassed a property on which there is no *constructed* unit." (Emphasis in original.) *Id.* at 79 (citing *Hatfield v. La Charmant Home Owners Ass'n,* 469 N.E.2d 1218, 1221-22 (Ind. Ct. App. 1984) (developer who held title on uncompleted and unsold units was a unit owner and thus subject to the same assessments as any other unit owner) (citing *Brooks v. Palm Bay Towers Condominium Ass'n,* 375 So. 2d 348, 349-50 (Fla. Ct. App. 1979) (developer was a unit owner obligated to pay proportionate share of common expenses))).

¶ 41    However, the Wisconsin Act *also* provided that " '[f]unds for the payment of common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against the unit owners in proportion to their percentage interests in the common elements *or as otherwise provided in the declaration*.' " (Emphasis added.) *Id.* at 77 (quoting Wis. Stat. § 703.16(2)). The declaration there "otherwise provided" that the property would *not* be assessed prior to construction of dwelling units. *Id.* at 79. Namely, the declaration required that assessments be paid on dwelling units only, as reflected by various provisions therein

maintaining a distinction between the land versus dwelling or living units and planned units versus built units. *Id.* at 79-80. Thus, the court held that unit owners were not subject to assessments prior to construction of a dwelling unit on their property. *Id.* at 81.

¶ 42   In contrast to the statutory scheme and declaration at issue in *Aluminum Industries*, here, the Act provides that "[i]t shall be the duty of each unit owner *including the developer* to pay his proportionate share of the common expenses [in the same ratio as the percentage of ownership in the common elements set forth in the declaration] commencing with the first conveyance." (Emphasis added.) 765 ILCS 605/9(a) (West 2018). There is also nothing in the declaration stating that only improved or dwelling units are subject to assessments. Rather, all units are treated identically in the declaration. Accordingly, there is no basis upon which to exempt Holtgren's units from assessments. Thus, the trial court did not err in granting the association's motion to dismiss the second amended complaint with prejudice.

¶ 43                                                    III. CONCLUSION

¶ 44   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 45   Affirmed.